# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2021-NMSC-026**

**Filing Date:  June 30, 2021**

**No. S-1-SC-38356**

**SEN. CLIFF PIRTLE, REP. ZACH COOK,
REP. REBECCA DOW, SEN. CRAIG BRANDT,
REP. WILLIE MADRID, REP. ALONZO BALDONADO,
SEN. BILL SHARER, SEN. GABRIEL RAMOS,
SEN. MARK MOORES, SEN. PAT WOODS,
SEN GREGG FULFER, REP. GREGG SCHMEDES,
REP. KELLY FAJARDO, REP. DAVID GALLEGOS,
REP. CANDIE SWEETSER, SEN. CANDACE GOULD,
SEN. SANDER RUE, REP. CATHERINE BROWN,
REP. RACHEL BLACK, REP. JANE POWDRELL-CULBERT,
REP. TIM LEWIS, SEN. RON GRIGGS,
SEN. GREGORY BACA, SEN. CLEMENTE SANCHEZ,
AUBREY DUNN,**

       Petitioners,

v.

**LEGISLATIVE COUNCIL COMMITTEE
OF THE NEW MEXICO LEGISLATURE,**

       Respondent.

**ORIGINAL PROCEEDING**

Released for Publication August 17, 2021.

Western Agriculture, Resource and Business Advocates, LLP
A. Blair Dunn, Esq.
Albuquerque, NM

for Petitioners

Hinkle Shanor, LLP
Thomas Mark Hnasko
Santa Fe, NM

UNM School of Law
Michael B. Browde

Albuquerque, NM

for Respondent

**OPINION**

**NAKAMURA, Justice.**

**{1}**     In these turbulent, ever-evolving pandemic times, governmental entities across the country have been called upon to make difficult decisions on how best to remain effective in discharging their duties, and to do so in a manner designed at once to comport with constitutional requirements and protect the health and safety of their leaders, members, staff, and, principally, the citizenry they serve. This original proceeding in mandamus represents a challenge—albeit an exceedingly narrow challenge— to such tightrope decision-making. The parties' pleadings center on a single issue: the constitutionality of a June 9, 2020, directive promulgated by the New Mexico Legislative Council (the Council). The directive, among other things, banned in-person attendance at a then-impending special legislative session that was called to address COVID-19-related and other issues. Petitioners invoke Article IV, Section 12 of the New Mexico Constitution and general notions of due process as prohibiting the "closing" of the special session and argue that the Council's directive exceeded constitutional limits. Having denied the petition in a prior order issued after oral argument, we write to explain the reasoning and rationale for our ruling.

## I.     BACKGROUND

**{2}**     New Mexico, along with the rest of the nation, has for over a year battled a pervasive health crisis occasioned by the COVID-19 pandemic. The rapid spread and all too often deadly nature of this novel coronavirus—for which there was no vaccine or cure at the time the Council took its challenged action—are reflected in the chilling statistics compiled throughout the pandemic. As of June 6, 2020, within days of the Council's issuance of the directive, 1.86 million COVID-19 cases were confirmed across the United States with nearly 108,000 deaths. *See* World Health Organization, *Coronavirus Disease (COVID-19) Situation Report No. 138*, at 7 (June 6, 2020).[1] On June 9, the very day the Council issued the directive, New Mexico alone had confirmed more than 9,100 cases with 404 deaths. *See* N.M. Dep't of Health News Alert, *Updated New Mexico COVID-19 Cases, Now at 9,105* (June 9, 2020).[2] Although the efficacy of the Council's directive must be measured by the facts and circumstances that confronted the Council in June 2020, we would be remiss if we did not acknowledge the

---

[1]Available at https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200606-covid-19-sitrep-138.pdf?sfvrsn=c8abfb17_4 (last visited June 24, 2021).
[2]Available at https://cv.nmhealth.org/2020/06/09/updated-new-mexico-covid-19-cases-now-at-9105/ (last visited June 24, 2021).

tragic reality that the national death toll caused by the pandemic recently climbed past 600,000 lives lost.[3]

**{3}**    The pandemic was met with an immediate and concerted response from our state's executive branch. On March 11, 2020, contemporaneous with the reporting of the first confirmed cases of COVID-19 in New Mexico, Governor Michelle Lujan Grisham issued the first of a series of public health emergency declarations.[4] This prompted the issuance of a series of emergency public health orders, which beginning on March 16, 2020, restricted mass gatherings and various business operations. *See* N.M. Dep't of Health, Public Health Order (March 23, 2020).[5] To date, each of the Governor's emergency declarations has emphasized the need "for all branches of State government" to take or continue taking action to minimize the spread of the virus and to reduce its "attendant physical and economic harms," while each of the public health orders has set forth the same or similarly worded "core directive" cautioning "all New Mexicans [to] stay[] in their homes for all but the most essential activities and services." *See, e.g.*, State of N.M. Executive Order 2020-036 (June 1, 2020);[6] N.M. Dep't of Health, Public Health Order, (June 1, 2020).[7]

**{4}**    In mid-May 2020 at an online news conference, the Governor called for a special legislative session to address, among other issues, the economic fallout of the pandemic. *See* Dan Boyd & Dan McKay, *Legislative Special Session Set for June 18*, Albuquerque Journal (May 20, 2020).[8] In anticipation of the special session, the Council convened on June 9, 2020—remotely by video conference—to iron out what the minutes of that meeting described as "Special Session Logistics." *See* N.M. Legislative Council, *Minutes of the Three-Hundred-Ninety-Second Meeting*, at 1-2 (June 9, 2020).[9] Consistent with both the Governor's executive orders encouraging all governmental branches to take steps to curb the spread of the virus and the Secretary of Health's emergency stay-at-home orders, the Council passed—with bipartisan support and no opposition—a directive prohibiting on-site, public attendance at the special session, while allowing some, but not unlimited, in-person media coverage of the event. *See* N.M. Legislative Council *supra* at 2-3.

**{5}**    The special session commenced on June 18, 2020, as scheduled. "[E]ach session of the house and senate and the committee meetings of each body [were] webcast," as independently required by a preexisting legislative rule. *See* N.M.

---

[3]*See* Centers for Disease Control and Prevention, *COVID Data Tracker*, available at https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited June 24, 2021).

[4]Available at https://cv.nmhealth.org/wp-content/uploads/2020/03/Executive-Order-2020-004-r.pdf (last visited June 24, 2021).

[5]Available at https://cv.nmhealth.org/wp-content/uploads/2020/03/SignedPHO03-24-2019.pdf (last visited June 24, 2021).

[6]Available at https://cv.nmhealth.org/wp-content/uploads/2020/06/Executive-Order-2020-036.pdf (last visited June 24, 2021).

[7]Available at https://cv.nmhealth.org/wp-content/uploads/2020/06/060120-PHO.pdf (last visited June 24, 2021).

[8]Available at https://www.abqjournal.com/1457904/governor-to-give-covid-19-briefing-with-nm-case-trends-improving.html (last visited June 24, 2021).

[9]Available at https://nmlegis.gov/minutes/ALCminJun09.20.pdf (last visited June 24, 2021).

Legislature, *Joint Rules*, Rule 12-1C.[10] In addition, the Council made provision for the taking of public comments in real time during the committee meetings, and for proposed legislative measures and relevant agendas to be posted in advance on the Legislature's website. *See* N.M. Legislature Home Page, Twitter Feeds (June 18, 2020).[11]

**{6}**     Shortly before the start of the special session, Petitioners sought a writ of mandamus from this Court, declaring unconstitutional that portion of the Council's directive prohibiting in-person attendance at the special session. The crux of Petitioners' constitutional claim was two-fold: that enforcement of the Council's directive would (1) effectively "close" the special session and, in so doing, violate Article IV, Section 12 of the New Mexico Constitution, and (2) violate the citizenry's due process right "to participate in the legislative process." We denied the petition and, for reasons developed in Part II(C) below, remain unpersuaded that Petitioners' constitutional claims, as pleaded, prevail in the context of this mandamus proceeding.

## II.     DISCUSSION

**{7}**     Of the two constitutional grounds advanced by Petitioners, only their claim founded on the "public" sessions provision of Article IV, Section 12 warrants extensive discussion in this opinion, and this is in large part to provide comment on the dissent's unduly expansive treatment of that claim. As will be discussed, Petitioners' state constitutional argument, as narrowly set out in the mandamus petition, is tethered tightly to an ultimately unconvincing plain-language, *textual* analysis of the term "public," an analysis incompatible with the multiple meanings of that term as reflected in dictionary definitions in use at the time our state Constitution was adopted and ratified. The dissent resolves the quandary presented by Petitioners' own narrow pleading choices by essentially ignoring them and in their place crafting unsolicited a *historical* analysis that goes far afield of the textual issue framed in the petition. As explained in greater detail later in this opinion, we in the majority decline to follow that uncharted, unbriefed, and unvetted path. Rather, we adhere to established jurisprudential norms in deciding the public sessions issue exactly as it was presented, by evaluating the merits of the pure textual analysis exclusively relied on by Petitioners.

**{8}**     Before considering the constitutional questions raised in the petition, we pause to consider two preliminary, threshold issues, one involving Petitioners' standing to challenge the Council's directive and the other concerning the Council's authority to have issued the directive.

## A.     Standing

**{9}**     On the issue of standing, we begin by noting that all but one of the Petitioners are state senators or state representatives (the Legislative Petitioners)—so far as it appears, solely in their representative capacities as legislators—who seek to litigate their disagreement with the Council's decision to "close" the special session. The

[10]Available at https://www.nmlegis.gov/Publications/Legislative_procedure/joint_rules.pdf (last visited June 24, 2021).
[11]Available at https://www.nmlegis.gov/ (last visited June 24, 2021).

Legislative Petitioners are joined in their cause by Petitioner Dunn, a private citizen who is described in the petition as one of "many rural New Mexicans lack[ing] access to reliable internet service that would provide the opportunity to participate in [the special session remotely via] livestream or webcast."

{10}    Significantly, none of the Petitioners specifically allege a "beneficial[] interest[]" in the outcome of this mandamus proceeding or any "particularized nexus between their specific interests and the duties of state officials." *See State ex rel. Coll v. Johnson*, 1999-NMSC-036, ¶ 17, 128 N.M. 154, 990 P.2d 1277 (articulating the rule that "the existence of a generalized duty that state officials owe to the people of the state as a whole, such as . . . passing and signing lawful legislation[,] . . . is not sufficient to authorize an enforcement action [in mandamus] by a person seeking to serve as a 'private attorney general'"). As for the Legislative Petitioners, the basis of their individualized standing is neither expressly alleged in the petition nor otherwise apparent. *See Raines v. Byrd*, 521 U.S. 811, 821, 829-30 (1997) (denying standing to congressional members who "alleged no injury to themselves as individuals," and who sustained, at most, "a loss of political power, not loss of any private right"); *Markham v. Wolf*, 136 A.3d 134, 145 (Pa. 2016) (recognizing that "legislative standing is appropriate only in limited circumstances" which do not include a legislator's claim that is "akin to a general grievance about the correctness of governmental conduct"); *see also* Michael B. Miller, *The Justiciability of Legislative Rules and the 'Political' Political Question Doctrine*, 78 Cal. L. Rev. 1341, 1366 (1990) (noting that "[v]irtually all congressional standing cases are founded upon [the] fundamental principle [that] . . . the congressional plaintiff must have suffered an injury that cannot be redressed by his fellow legislators").

{11}    With respect to Petitioner Dunn, it is at least arguable that, as a concerned citizen, he has direct standing to challenge the constitutionality of the Council's directive barring in-person attendance at the special legislative session. *See State ex rel. Burg v. City of Albuquerque*, 1926-NMSC-031, ¶ 20, 31 N.M. 576, 249 P. 242 (noting the general rule that mandamus may lie "to enforce the performance of a public duty by public officers, upon application of any citizen whose rights are affected in common with those of the public," and applying the rule to a plaintiff who sought to vindicate his own individual right to vote on the proposition at issue). Notably, however, Petitioner Dunn does not explicitly stake out such a direct standing claim in the petition. Instead, he asks this Court to confer standing on him solely by reason of the great public importance doctrine. We confer standing on Petitioner Dunn in his individual capacity in recognition of the importance of the constitutional questions involved. *See, e.g., New Energy Econ., Inc. v. Martinez*, 2011-NMSC-006, ¶ 13, 149 N.M. 207, 247 P.3d 286 (reiterating that "[t]his Court, in its discretion, may grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance" (internal quotation marks and citation omitted)). This allows the proceeding to move forward irrespective of any standing problems relating to the Legislative Petitioners. *See Horne v. Flores,* 557 U.S. 433, 446 & n.2 (2009) (concluding that a school superintendent had standing to seek vacatur of a trial court's orders, while declining to consider whether the state legislature also had standing to pursue identical relief); *see generally Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 217 (4th Cir. 2017) (applying the principle that once a court

decides "that a single party ha[s] standing, it ma[k]e[s] no difference to the resolution of [the] case whether any other party ha[s] standing").

## B.    The Council's Authority to Act

**{12}**    We turn next to the question of the Council's authority to have issued the directive in the first place (the authority issue).[12] Viewed most liberally in favor of Petitioners, the petition can be read to state—but not to explain—the view that "[a] small segment of [l]egislators should not be allowed to eschew [sic] the [Legislature] from its constitutional boundaries" and that the Council's role in developing safety policies should be limited to "taking action to introduce such measures" as "capacity limitations, social distancing . . . , [and personal protective equipment] requirements such as masks," and not to "cut off public access altogether."

**{13}**    Picking up on the authority issue and providing legal analysis missing from the petition, the dissent, ¶¶ 89-97, casts the issue as an alternative basis on which to grant Petitioners mandamus relief. Amplifying Petitioners' vaguely stated premise, the dissent narrowly construes the relevant statutory scheme to support its conclusion that the power of the Legislature to take action on matters touching upon public access to the Capitol building resides not with the Council but with the Legislature as a whole. As we will explain, adoption of the dissent's position is unwarranted since it rests on too restrictive a reading of the statutory provisions setting forth the Council's operational powers and duties. *See* NMSA 1978, §§ 2-3-3 (1978), 2-3-4 (1967), 2-3-5(I) (1967).[13]

## 1.    General principles of statutory interpretation

**{14}**    The authority issue requires us to determine the intended purpose and effect of the statutory sections cited above. *See Jordan v. Allstate Ins. Co.*, 2010-NMSC-051, ¶ 15, 149 N.M. 162, 245 P.3d 1214 ("This Court's primary goal when interpreting statutes is to further legislative intent."). In determining legislative intent, we look to the plain language of the statute and the context in which it was enacted, taking into account its history and background. *See Maes v. Audubon Indem. Ins. Grp.*, 2007-NMSC-046, ¶ 11, 142 N.M. 235, 164 P.3d 934. We examine an act in its entirety, "constru[ing] each part in connection with every other part to produce a harmonious whole, . . . and consider[ing] the practical effects of our interpretation." *Reule Sun Corp. v. Valles*, 2010-NMSC-004, ¶ 41, 147 N.M. 512, 226 P.3d 611 (internal quotation marks and citation omitted). Our application of the canons of statutory interpretation is guided by an awareness of the proposition that "it is necessary [for judges] to think thoughts and not words." *State v. Strauch*, 2015-NMSC-009, ¶ 13, 345 P.3d 317. Additional and more specific principles of statutory interpretation also guide our analysis and will be discussed as needed.

---

[12]Although the statutorily-based authority issue is separate and distinct from the constitutional issues on which Petitioners' standing was founded, we conclude that the two species of claims are sufficiently intertwined as to warrant mandamus review of both.

[13]For purposes of our discussion, we assume, without deciding, that the authority issue presents a justiciable question. *But see* Part II(C)(1) *infra*.

## 2.     Statutory analysis

**{15}**     The Council is a creature of statute as are its composition, duties, and powers; all are products of enabling legislation—NMSA 1978, §§ 2-3-1 to -19 (1951, as amended through 2021). The Legislature established the Council as a joint committee consisting of sixteen of its own members, eight from each house, including the Legislature's four highest-ranking members——the president pro tempore and the minority floor leader of the senate, as well as the speaker and the minority floor leader of the house of representatives. Section 2-3-1. The statute elsewhere lays out the parameters of the Council's authority, which is fairly characterized as broad and multifaceted. Among its other duties, the Council is tasked with creating——and adopting rules of procedure for use by——legislative committees formed "to study major problems during the periods when the [L]egislature is not in session," § 2-3-3(D), (E); and formulating policies for and supervising the activities of the legislative council service (the Council Service), § 2-3-3(B), a legislative entity created to provide support services to all three branches of state government. Most significantly for our purposes, the Council Service exercises operational control over the Capitol building and grounds. Sections 2-3-4, 2-3-5.

**{16}**     The direct and supervisory operational control features of the Council's duties—as set forth in Sections 2-3-4 and 2-3-5(I)—warrant our attention here. We address first Section 2-3-5, which delineates the supervisory scope of the Council's operational activities. Specifically, as here relevant, the statute requires the director of the Council Service (the Director), "under the direction of the . . . [C]ouncil," to "make all rules and regulations for the conduct of all persons in and about the buildings and grounds under his control necessary and proper for the safety, care and preservation of the same." Section 2-3-5 (I).[14]

**{17}**     Although the statute grants the Director—and, by extension, the Council—seemingly broad power to regulate "conduct" as is "necessary and proper for the safety, care and preservation" of the Capitol buildings and grounds, it does not textually address, by illustration or otherwise, the intended limits of that power. The statute, even if not ambiguous in a strict legal sense, is by no means a model of legislative clarity. When called upon to interpret statutory provisions "giving rise to genuine uncertainty as to what the [L]egislature was trying to accomplish," we look beyond the language to the purpose of the statute to ascertain legislative intent. *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352 (recognizing that judicial interpretation to ascertain legislative intent is permitted if there is "*any doubt*" as to the meaning of statutory language).

**{18}**     The pivotal question at this stage of our analysis, then, is whether the Council's directive barring in-person attendance at the special session during the throes of a

---

14For reasons not altogether clear, virtually identical language as that quoted here appears in a closely related section of Chapter 2, Article 3, specifically Section 2-3-7. As here relevant, the only distinguishing feature between the two sections is that Section 2-3-7 is made to govern the legislative "*building* and grounds" while Section 2-3-5 is made to govern the legislative "*buildings* and grounds." (Emphasis added.) Without determining the legislative purpose behind each of these seemingly overlapping sections, the Court will refer for consistency's sake only to Section 2-3-5 in this opinion.

pandemic falls within the type of operational decision-making authority the Legislature intended to delegate to the Council under Section 2-3-5(I). Focusing on and reading strictly the phrase, "safety, care and preservation of the [Capitol buildings and grounds]," the dissent would invalidate the directive as beyond the purview of the Council's statutory authority. Under the dissent's construction, the Council's right to regulate conduct in this area would be narrowly confined to conduct that poses some danger to the Capitol's physical plant or grounds, with no room afforded to regulate conduct that threatens the safety of those who work in or frequent the Capitol complex. As will be seen, this view does not withstand close scrutiny.

**{19}** First, such a narrow reading of Section 2-3-5(I) is inconsistent with the fundamental and closely related tenets of statutory construction that courts read an entire statute as a whole, considering statutory provisions in relation to one another, *State v. Jade G.*, 2007-NMSC-010, ¶ 15, 141 N.M. 284, 154 P.3d 659, and give effect to all provisions of a statute so as to render no part inoperative or surplusage. *See GandyDancer, LLC v. Rock House CGM, LLC,* 2019-NMSC-021, ¶ 22, 453 P.3d 434 ("A statute must be construed so that no part of the statute is rendered surplusage or superfluous." (internal quotation marks and citation omitted)); 2A Norman J. Singer & Shambie Singer, *Sutherland Statutory Constr.*, § 46:6, 256-59, 259 n.6 (7th ed.) ("Courts assume that every word, phrase, and clause in a legislative enactment is intended and has some meaning and that none was inserted accidentally."); *see also Van Ee v. Env't Prot. Agency*, 202 F.3d 296, 302 (D.C. Cir. 2000) ("[e]ndeavoring to give effect to each term" used in a statute and recognizing "the need to give . . . neighboring terms independent meaning").

**{20}** It is true that the Legislature's use in Section 2-3-5(I) of the terms "care" and "preservation" alone in relation to the Capitol buildings and grounds could arguably support the dissent's view that the provision is designed to protect only the physical integrity of the Capitol buildings themselves and to avoid damage to their grounds. Dissent ¶ 94. The terms "care" and "preservation" have long been used in tandem in connection with the custody and maintenance of buildings and property, not the protection of people. *See, e.g.*, *Jones v. Commonwealth*, 591 S.E.2d 72, 76 (Va. 2004) (noting that, pursuant to statute, a state university's board of visitors was "charged with the care and preservation of all property belonging to the [u]niversity"); *Sorenson v. Andrews*, 264 N.W. 562, 565 (Iowa 1936) (discussing statutes that "impose on the [county] board of supervisors definite duties with reference to the care and preservation of public property and buildings").

**{21}** However, the intended meaning of Section 2-3-5(I) is properly understood not by selected snippets of its text, but by the Legislature's actual word choice in using the trio of terms, "*safety*, care and preservation" (emphasis added), in setting forth the Council's supervisory, operational duties vis-à-vis the Capitol buildings and grounds. The Legislature's inclusion of the word *safety* materially alters the equation because that term, when used in relation to buildings or property, readily encompasses the safety of those who occupy or visit a building. *See, e.g.*, *Worth Distribs., Inc. v. Latham*, 451 N.E.2d 193, 194 (N.Y. 1983) (recognizing that municipal regulations relating to building safety "were designed to protect the general public"); *409 Land Tr. v. City of S. Bend*,

709 N.E.2d 348, 351 (Ind. Ct. App. 1999) (acknowledging the government's strong police power interest in enforcing building safety regulations "for purposes of public health, safety, or welfare"). Giving the term "safety" as used in Section 2-3-5(I) its own meaning independent of its neighboring terms, *see Van Ee*, 202 F.3d at 302, it is unlikely that the Legislature intended to exclude public safety considerations from the statute's reach.

{22}    This same premise guides our analysis of Section 2-3-4 (enacted in 1967), again counseling against the adoption of a narrow gloss on the Council's operational authority. Section 2-3-4 provides in full that

> Notwithstanding the [financing and accounting] provisions of Chapter 6, Articles 1 and 2, NMSA 1953, the exclusive *control*, care, custody and maintenance of the building in which the legislature is housed, the adjacent utilities plant and the surrounding grounds are transferred from the capitol buildings improvement commission, and the capitol custodian commission, to the legislative council.

(Emphasis added.) Thus, among other things, the statute vests in the Council the exclusive control over the legislative complex and grounds and, as we next discuss, transfers that authority to the Council from two distinct and now-defunct nonlegislative bodies, the capitol buildings improvement commission and the capitol custodian commission. Our interest lies in the capitol custodian commission (the CCC), whose membership during its existence consisted of the governor, the secretary of state, and the attorney general and whose duty it was to hire and oversee the work of a capitol custodian. *See* NMSA 1953, §§ 6-1-9 to -11 (1959, repealed 1971). In turn, "[t]he capitol custodian, under the direction and supervision of the [CCC]," was given "the custody and control of the state capitol grounds and buildings and premises." NMSA 1953, § 6-1-11. Among the duties statutorily assigned to the capitol custodian was the responsibility—the self-same responsibility now delegated to the Council—to "make all rules and regulations for the conduct of all persons in and about the buildings and grounds necessary and proper for the *safety*, care and preservation of the same." *Id.* (emphasis added).

{23}    Given the substantial overlap in the designated operational duties of the CCC and the Council, and the use in their respective enabling statutes of the identical "safety, care and preservation" language discussed above, we are unconvinced by the dissent's downplay of the import of Section 2-3-4 in that section's express delegation to the Council of "exclusive control" over the Capitol buildings and grounds. Based on the historical evolution of Section 2-3-4, it is not unreasonable to construe the statute as authorizing the Council's consideration of the safety of people in exercising its operational authority over the Capitol complex.

{24}    A more restrictive reading of the relevant statutes—one limiting the Council's operational duties to those that protect the condition of the Capitol *buildings* and *grounds* while excluding the Council's consideration of *public safety* concerns—would have the unwanted consequence of hindering the all-important efforts of the Council

and Director to provide adequate security and safety measures in and around the Capitol complex. Indeed, our adoption of such a strict and artificial construction would cast doubt on the efficacy of all manner of routine, but nonetheless important, decisions the Council—the legislative body entrusted with the care and custody of the Capitol complex and the duty to "represent[] the entire Legislature while that body is not in session" —might ordinarily be expected to make. *See State ex rel. Riddle v. Oliver*, 2021-NMSC-018, ¶ 19, 487 P.3d 815.

**{25}** Take, for example, a hypothetical decision by the Council to ban the use of scooters, skateboards, and skates on the walking paths of the Capitol grounds. Under the dissent's interpretive formulation, such a seemingly reasonable prohibition would likely prove to be invalid since it might well be considered necessary to protect pedestrians strolling the Capitol grounds but not to preserve the grounds themselves. We would require far more explicit statutory direction before adopting such a rigid statutory interpretation, one intruding upon the "exclusive control" of the Capitol building and grounds conferred upon the Council by Section 2-3-4, and with no apparent benefit. *See generally State v. Almanzar*, 2014-NMSC-001, ¶ 15, 316 P.3d 183 ("We reject a mechanical statutory construction when the results would be absurd, unreasonable, or contrary to the spirit of the statute." (internal quotation marks and citation omitted)).

**{26}** An additional issue should be addressed. We note that the authority Section 2-3-5(I) entrusts upon the Council to "make all rules and regulations for the conduct of all persons in and about the [Capitol] buildings and grounds" appears broad enough to authorize the Council, in appropriate circumstances when needed to protect public safety, to prohibit conduct altogether in the form of a temporary ban on public use of the Capitol complex. Although Section 2-3-5(I) neither clearly excludes nor clearly includes the authority to prohibit public attendance altogether, this Court has long espoused the view that "[t]he spirit, as well as the letter of the statute, must be respected; and where the whole context of a law demonstrates a particular intent in the [L]egislature to effect a certain object, some degree of implication may be called in to aid that intent." *United Rentals Nw., Inc .v Yearout Mech., Inc.*, 2010-NMSC-030, ¶ 16, 148 N.M. 426, 237 P.3d 728 (first alteration in original) (internal quotation marks and citation omitted). It follows that the absence of the term *prohibit* from the broad rulemaking authority set forth in Section 2-3-5(I) is not decisive where its companion Section 2-3-4 clearly confers upon the Council the "exclusive control" of the Capitol buildings and grounds. Given the extensive and exclusive operational authority vested in the Council, it is fair to conclude that "[w]hatever difference exists between the power to regulate and the power to prohibit, in the context of this case, is one of words and not substance." *Outdoor Sys., Inc. v. City of Mesa*, 819 P.2d 44, 48 (Ariz. 1991) (en banc) (internal quotation marks and citation omitted) (concluding that the power given to municipalities under a state statute to "regulate" billboards was sufficiently broad to convey the power to "prohibit" certain types of billboards, where the statute vested the city with "'broad authority'" to regulate land uses). The imprudence and impracticality of a contrary view are brought into sharp relief when one considers the exigencies of this time and the heightened dangers statehouses face nationwide, not only from the pandemic but from the serious,

targeted, and ongoing threats of political violence directed at these, among our most hallowed, institutions.[15]

**{27}**   In all, it cannot be said—at least not with sufficient certitude to warrant mandamus relief—that the Council overstepped its statutory authority in taking action to address what Petitioners readily acknowledge to have been pressing public safety concerns arising from the public's physical presence at what was, in the true sense of the word, a *special* legislative session.

## C.   The Constitutionality of the Council's Directive

**{28}**   As we segue into our consideration of the constitutional ramifications, if any, of the Council's directive, it is worthwhile to discuss the origins and breadth of the power given our Legislature—similar to the power given Congress and most state legislatures nationwide—to adopt its own rules of procedure. *See* N.M. Const. art. IV, § 11 ("Each house may determine the rules of its procedure[.]")

### 1.   The Legislature's broad rulemaking prerogative

**{29}**   The exclusive authority vested in the majority of American state legislatures to make their own procedural rules finds its historical roots in British law favoring parliamentary autonomy and dates back at least to the English Bill of Rights of 1688, which contained a provision denouncing the "impeach[ment] or question[ing]" of "the Freedome of Speech and Debates or Proceedings in Parlyament, . . . in any Court or Place out of Parlyament." 1 W. & M., Sess. 2, ch. 2 (1688).[16] The emphasis placed on legislative autonomy over procedural matters under British law was carried over to the American colonies, whose legislatures, "[l]ong before the American Revolution, . . . strove to emulate Parliament's independence" based on several concerns, including, perhaps most prominently, those involving the careful balance and separation of powers between coordinate branches of government. *See* James E. Castello, *The Limits of Popular Sovereignty: Using the Initiative Power to Control Legislative Procedure*, 74 Cal. L. Rev. 491, 530-32, 539-43, 547, 549 (1986) (tracing the history of constitutional rulemaking clauses in America). In modern times, "the power of a legislative body to govern its own internal workings [is] viewed as essential to its functioning except as it may . . . be[] expressly constrained by . . . [c]onstitution[al limits]." *People's Advoc., Inc. v. Superior Ct.*, 226 Cal. Rptr. 640, 642 (Cal. Ct. App. 1986).

**{30}**   In practical terms, legislative rulemaking powers are comprehensive and far-reaching, allowing, for example, a legislative body to create and delegate authority to a committee, commission, or other entity to assist in administering or enforcing a procedural rule. *See Webb v. Rock*, 400 N.E.2d 959, 961-62, 965 (Ill. App. Ct. 1980) (upholding the validity of a statute delegating legislative power over certain administrative responsibilities to the majority and minority leadership of the state senate and the house of representatives and to members of certain legislative committees and

---

15Available at https://www.governor.state.nm.us/wp-content/uploads/ 2021/01/Executive-Order-2021-002.pdf (last visited June 24, 2021).
16Available at https://www.legislation.gov.uk/aep/WillandMarSess2/1/2 (last visited June 24, 2021).

commissions "as determined by such leadership" (internal quotation marks and citation omitted)); *Joint Legis. Comm. on Ethical Standards v. Perkins*, 432 A.2d 116, 121-22 (N.J. Super. Ct. App. Div. 1981) (recognizing that the legislature "has the power to set reasonable rules for the . . . order of its houses"; "to establish by general laws restrictions on the conduct of persons, including legislators, within a common classification"; and "to establish an agency or body to enforce those general laws"). And, to dispel any doubt, the term "procedural rules" is sufficiently broad to "include the question whether legislative business should be conducted in open or closed session." *Hughes v. Speaker of the N.H. House of Representatives*, 876 A.2d 736, 748 (N.H. 2005) (citing *Abood v. League of Women Voters of Alaska*, 743 P.2d 333, 337 (Alaska 1987) (recognizing that "[t]he question whether legislative business should be conducted in open or closed sessions is a procedural question which has traditionally been the subject of legislative rules")).

{31}    Courts have shown a marked reluctance to interfere with a legislative body's application or interpretation of its own procedural rules, generally declining to review such determinations as involving questions beyond the judiciary's reach. *See Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1171-72 (9th Cir. 2007) (pointing to the federal Rulemaking Clause, U.S. Const., art. 1, § 5, in concluding that "whether Congress decides to hold a hearing on legislation applicable to the general public is a non-justiciable political question beyond our power to review"); *League of Women Voters of Wis. v. Evers*, 2019 WI 75, ¶ 37, 387 Wis. 2d 511, 929 N.W.2d 209 ("*How the* [*l*]*egislature meets*, when it meets, and what descriptive titles the [l]egislature assigns to those meetings or their operating procedures constitute parts of the legislative process with which the judicial branch has no jurisdiction or right to interfere." (emphasis added) (internal quotation marks and citation omitted)). The judiciary's hands-off approach in this arena and—perhaps more important for our purposes—the judicial focus on constitutional boundaries in reviewing legislative procedural rules has been authoritatively stated as follows:

> The [C]onstitution empowers each house to determine its rules of proceedings. *It may not by its rules ignore constitutional restraints or violate fundamental rights*, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. *But within these limitations* all matters of method are open to the determination of the house, and it is no impeachment of the rule to say that some other way would be better, more accurate, or even more just. It is no objection to the validity of a rule that a different one has been prescribed and in force for a length of time. The power to make rules is not one which once exercised is exhausted. It is a continuous power, always subject to be exercised by the house, and, *within the limitations suggested*, absolute and beyond the challenge of any other body or tribunal.

*United States v. Ballin*, 144 U.S. 1, 5 (1892) (emphasis added).

**{32}** Under the *Ballin* formulation, "the advantages or disadvantages, the wisdom or folly, of . . . a [legislative procedural] rule" are of no judicial concern; it is only when a legislative body adopts internal procedures that "ignore constitutional restraints or violate fundamental rights" that a court can and must become involved. *Id.*; *see Vander Jagt v. O'Neill*, 699 F.2d 1166, 1170 (D.C. Cir. 1983) (recognizing that a court "must provide remedial action" in the event Congress adopts internal procedures that violate the "constitutional restraints" or "fundamental rights" exception to nonjusticiability carved out in *Ballin*). We turn, then, to the core question whether, as here pleaded, the terms of the Council's directive exceed constitutional limits.

## 2. Relevant legal standards

**{33}** As indicated, Petitioners advance two distinct constitutional claims. Petitioners first contend that the Council's directive prohibiting the public from physically attending the special session runs afoul of the mandate of Article IV, Section 12 of the New Mexico Constitution that "all sessions of each house shall be public" and, second, that the directive deprives New Mexico "citizens of their owing due process of law to participate in the legislative process."

**{34}** Thus, in the form presented by Petitioners, this mandamus proceeding is predominantly a case of constitutional interpretation. In interpreting a constitutional provision, our primary goal is to discern and give effect to the drafters' intent. *See State v. Boyse*, 2013-NMSC-024, ¶ 8, 303 P.3d 830 ("The most important consideration for us is that we interpret the constitution in a way that reflects the drafters' intent." (internal quotation marks and citation omitted)). Questions of constitutional construction are governed by the same rules that apply to statutory construction, with courts "often using the dictionary for guidance" in ascertaining the ordinary meaning of the words at issue. *Id.* ¶¶ 8-9.

**{35}** The outcome of this case is dictated in large measure by the narrow contours of the writ of mandamus, which this Court has described as "a drastic remedy to be invoked only in extraordinary circumstances" and then "only to force a clear legal right against one having a clear legal duty to perform an act." *State ex rel. Richardson v. Fifth Jud. Dist. Nominating Comm'n*, 2007-NMSC-023, ¶ 9, 141 N.M. 657, 160 P.3d 566 (internal quotation marks and citation omitted); *see Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary*, 93 F.3d 103, 112 n.9 (3d Cir. 1996) (observing that the legal duty sought to be enforced by mandamus must be "positively commanded and so plainly prescribed as to be free from doubt" (internal quotation marks and citation omitted)). Although relief by mandamus is most often applied "to compel the performance of an affirmative act by another where the duty to perform the act is clearly enjoined by law," *Rainaldi v. Pub. Emps. Ret. Bd.*, 1993-NMSC-028, ¶ 6, 115 N.M. 650, 857 P.2d 761 (internal quotation marks and citation omitted), the writ may also be used in appropriate circumstances "in a prohibitory manner to prohibit unconstitutional official action," *Am. Fed'n of State, Cnty. & Mun. Emps. v. Martinez*, 2011-NMSC-018, ¶ 4, 150 N.M. 132, 257 P.3d 952. Petitioners' request for mandamus relief fits within this second, "prohibitory" category.

**{36}**  For reasons that will become apparent in our ensuing discussion, the COVID-19 pandemic, though clearly and undisputedly providing the impetus for the Council's directive, does not directly factor into our analysis of Petitioners' constitutional claims. Nor, under our analysis, is Petitioners' entitlement to mandamus relief on their constitutional claims dependent on the deferential standard of review set out in *Jacobson v. Massachusetts* for governmental action taken to promote public health and safety in times of emergency. *See* 197 U.S. 11, 25, 29 (1905). The *Jacobson* Court upheld the constitutionality of a state compulsory-vaccination law enacted to combat a smallpox outbreak, and in so doing limited judicial scrutiny of emergency public health laws to those restrictions which have "no real or substantial relation" to the public health crisis then at hand or are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law"). *Id.* at 31. Resort to *Jacobson*'s deferential review standard is unnecessary in the context of this mandamus proceeding since, as fully explained below, Petitioners' submission to this Court was insufficient as a matter of law to demonstrate a clear cognizable constitutional right to physically attend the special legislative session. The prominent feature of the *Jacobson* doctrine—the restriction or suspension of existing constitutional rights during a public health crisis—finds no place in the situation which now confronts us in the majority where no constitutionally protected rights are determined to have been violated in the first place.

**{37}**  Nor, in the posture of this case, need we definitively weigh-in on the developing judicial discourse over the precise contours and proper application of the *Jacobson* doctrine. It suffices to say that, although *Jacobson* has recently been the subject of considerable criticism, its deferential police power review standard remains relevant today, save arguably in the context of free-exercise-of-religion cases. *Compare, e.g.*, *Fay v. Merrill*, ___A.3d___, No. SC 20486, 2021 WL 560780, ** 1, 16 (Conn. 2021) (recognizing that *Jacobson* and other federal case law "provide[] important context" for what was in essence a textual/historical analysis of whether a legislatively-ratified executive order "adding 'COVID-19' as a permissible reason for absentee voting" comported with the Connecticut state constitution), *with Roman Catholic Diocese of Brooklyn v. Cuomo*, ___U.S.___, 141 S. Ct. 63 (2020) (*per curiam*) (applying strict scrutiny to evaluate a challenge to California's COVID-19 restrictions on attendance at religious activities without discussing or citing *Jacobson*), *and Tandon v. Newsom*, ___U.S.___, 141 S. Ct. 1294 (2021) (*per curiam*) (same).

**{38}**  Against this backdrop and with these considerations in mind, we now consider in turn the constitutional challenges mounted by Petitioners.

### 3.  Petitioners' due process claim

**{39}**  We first address Petitioners' contention that the Council's directive violates our citizens' procedural due process rights of notice and an opportunity to be heard by denying them the ability "to participate in the legislative process." Petitioners broadly assert that the convening of "a closed or non-public session [constitutes] a due process violation by the Legislature," an assertion unsupported by prevailing case law. To begin, "The United States Supreme Court has not yet recognized a federal constitutional or common law right to attend legislative sessions." *Hughes*, 876 A.2d at 747-48 (noting

that "the right to observe deliberations of governmental bodies did not exist" in England and that "[t]he English tradition of holding legislative debate in secret was carried on in the legislative bodies of Colonial America[,]" as witnessed by the exclusion of the public from "both the Continental Congress and the Constitutional Convention" (quoting Larry M. Elison & Deborah E. Elison, *Comments on Government Censorship and Secrecy*, 55 Mont. L. Rev. 175, 179-80 (1994) (internal quotation marks omitted))); *Mayhew v. Wilder*, 46 S.W.3d 760, 776-77 (Tenn. Ct. App. 2001) (acknowledging that, although the United States Supreme Court has long recognized a "right of access to criminal trial proceedings even" though that right is "not specifically provided for in the [federal c]onstitution," there has never been a "common law right to attend meetings of other government bodies" as confirmed by the fact that "[l]egislative debates were traditionally held in secret in England and . . . colonial America").

**{40}** Further, at least two federal circuit courts have expressly rejected the notion that constitutional due process protections attend the passage of legislation. *See LC & S, Inc. v. Warren Cnty. Area Plan Comm'n*, 244 F.3d 601, 602 (7th Cir. 2001) (indicating that the prospective character and general applicability of legislation render the notion of "[l]egislative due process" essentially meaningless, if not "an oxymoron"); *United States v. LULAC*, 793 F.2d 636, 648 (5th Cir. 1986) ("When the legislature enacts a law . . . that affects a general class of persons, all of those persons have received procedural due process by the legislative process itself . . . . The challenges to such laws . . . must be based on their substantive compatibility with constitutional guarantees."). This view was given support by no less an authority than Alexander Hamilton, who stated on the eve of the 1787 Constitutional Convention that "[t]he words '*due process*' have a precise technical import, and are only applicable to the process and proceedings of the courts of justice; they can never be referred to an act of legislature." Founders Online, National Archives, *N.Y. Assembly Remarks on an Act Regulating Elections* (Feb. 6, 1787).[17]

**{41}** More broadly, the rule is settled that all governmental action that involves purely legislative—as opposed to adjudicative—decisions is not subject to the notice and hearing requirements of procedural due process. *See, e.g.*, *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994) ("[C]onstitutional due process requirements apply only where the official action is designed to adjudicate disputed facts in particular cases." (internal quotation marks and citation omitted)). In this regard, the Supreme Court has made clear that the appropriate relief for those who disagree with a governmental agency's adoption of a legislative-type decision lies not in a due process challenge to the decision itself, but in the democratic political process. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) (rejecting a due process challenge to a general, city-wide increase in tax evaluations of property, promulgated without an opportunity for taxpayers to be heard or to appear before the board, and in so doing, stating that the taxpayers' "rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the

---

17Available at https://founders.archives.gov/documents/Hamilton/01-04-02-0017#ARHN-01-04-02-0017-fn-0001 (last visited June 24, 2021).

rule"). Although policy decisions affecting the rights of a small number of people may invoke procedural due process protection,

> [w]hen governmental action affects more than a few individuals, concerns beyond economy, efficiency and expedition tip the balance against finding that due process attaches. We may expect that as the sweep of governmental action broadens, so too does the power of the affected group to protect its interests outside rigid constitutionally imposed procedures. Moreover, the case for due process protection grows stronger as the identity of the persons affected by a governmental choice becomes clearer[.]

*O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 800-01(1980) (Blackmun, J., concurring) (footnotes omitted) (internal quotation marks and citation omitted).

**{42}** Given these established precedents, and since the matter at hand does not present a situation where "[a] relatively small number of persons" were "exceptionally affected, in each case upon individual grounds," *Bi-Metallic*, 239 U.S. at 446, Petitioners' due process challenge to the Council's directive raises no colorable claim of denial of a constitutional right.

**4.     Petitioners' claim under Article IV, Section 12 of the New Mexico Constitution**

**{43}** We turn then to the state constitutional issue that divides the Court, narrowly framed by Petitioners as whether the Council's directive prohibiting in-person attendance at the special session contravenes the "plain language" of Article IV, Section 12 of the New Mexico Constitution. That section reads, in full:

> All sessions of each house shall be public. Each house shall keep a journal of its proceedings and the yeas and nays on any questions shall, at the request of one-fifth of the members present, be entered thereon. The original thereof shall be filed with the secretary of state at the close of the session, and shall be printed and published under his authority.

N.M. Const. art. IV, § 12.

**{44}** Petitioners' constitutional challenge is directed to the format and administration of the special session, not its subject matter. Despite the limited contours of their plain-language analysis, Petitioners press for a broad interpretation of Article IV, Section 12. Petitioners, now joined by the dissent, loosely paraphrase the provision's textual language to mean that "all sessions of the New Mexico Legislature shall be *open* to the public" (emphasis added) and maintain that the directive's edict "to close" the special session does not comport with that supposed requirement. Petitioners' argument primarily consists of a two-sentence passage, devoid of any citation of case authority, that is confined entirely to a single, unsupportable premise, that the wording of the constitutional provision is "clear and unambiguous." Petitioners argue no fall-back

position in the event—as turns out to be the case—that this Court rejects their plain-language argument. Significantly, Petitioners neither identify independent indicia of the drafters' intent nor mention, much less discuss, any canon of statutory or constitutional construction that would tip the scales in resolving any ambiguity in the constitutional public sessions provision in their favor. *See generally Boyse*, 2013-NMSC-024, ¶ 8 (noting that "the rules of statutory construction apply equally to constitutional construction" (internal quotation marks and citation omitted)).

**{45}** As explained below, we reject Petitioners' plain-language argument, concluding that the undefined and unadorned word "public" as used in Article IV, Section 12 yields no plain meaning supportive of Petitioners' cause. *See generally Chem. Waste Mgmt., Inc. v. U.S. EPA*, 873 F.2d 1477, 1480-82 (D.C. Cir. 1989) (concluding, in the failure of a statute to "ma[k]e clear the type of procedures intended," that Congress's intent behind the words "public hearing" was ambiguous).

**{46}** By way of background, the New Mexico Constitution was drafted and adopted at a convention meeting held in Santa Fe over a seven-week period in October and November 1910. *See Proceedings of the Constitutional Convention of the Proposed State of New Mexico* (1910). The Constitution was approved by the voters in January 1911 and went into effect at the inception of New Mexico statehood on January 6, 1912. *See* Robert W. Larson, *New Mexico's Quest for Statehood 1846-1912*, 288-90, 304 (1968). The transcriptions of New Mexico's constitutional convention neither contain debate or discussion of the public sessions provision in Article IV, Section 12 nor otherwise offer any hint of the drafters' intent with respect to that provision. *See Proceedings of the Constitutional Convention of the Proposed State of New Mexico* (1910) at 54-72 (incorporating the public sessions provision as Section 14 of what is now Article IV (Legislative Department)).

**{47}** Again, it bears emphasis that our overarching goal in construing the New Mexico Constitution is to ascertain the intent and objectives of the drafters. *Boyse,* 2013-NMSC-024, ¶ 8. In ascertaining the drafters' intent with respect to the public sessions requirement of Article IV, Section 12, we are guided by dictionary definitions reflecting the ordinary and accepted meaning of relevant terms. *See Boyse*, 2013-NMSC-024, ¶ 9; *see also Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560*,* 566-69 (2012) (surveying "relevant dictionaries" in determining the ordinary or common meaning of an undefined statutory term). Definitions from dictionaries that were in use at the time the New Mexico Constitution was adopted are a relevant source. *See Wis. Cent. Ltd. v. United States*, ___ U.S. ___, ___, 138 S. Ct. 2067, 2074 (2018) (articulating the "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute" (second omission in original) (internal quotation marks and citation omitted)).

a.   **Textual analysis**

**{48}** As will be shown, the adjective "public" did not have a single, definitive meaning at the turn of the twentieth century but instead was (and continues to be) an "elastic term with many different shades of meaning." *In re Gi Nam*, 273 F.3d 281, 287 (3d Cir.

2001) (internal quotation marks and citation omitted) (applying the quoted language to the term "penalty"). Dictionaries dating back to the late nineteenth and early twentieth centuries generally defined the term "public" to include a variety of senses, arguably the most prominent of which was the sense denoting something *known or notorious*—or, as at least two dictionary sources of the day put it, the opposite of "private." *See* William C. Anderson, *A Dictionary of Law* 842 (1893) (defining the adjective "public" as, among other things, "generally known. Opposed, *private*."); 8 *Oxford English Dictionary* 1558 (1st ed. 1933) (reissue of the *New English Dictionary* (1884-1928)) (describing the various definitions of "public" to mean "[i]n general, and in most of the senses, the opposite of PRIVATE").

**{49}** An alternative use of the term "public" as meaning "open," "open to all," or some other variant thereof was also common to legal and general dictionaries of that day, including the 1910 edition of *Black's Law Dictionary*. *See* Henry Campbell Black, *A Law Dictionary* 964 (2d ed. 1910) (defining the adjective "public" to mean, among other things, "[o]pen to all; notorious"); *see also* William Dwight Whitney, *The Century Dictionary* 4830 (1890) (defining "public" in the sense relevant here as "[o]pen to all the people"). That same 1910 edition of *Black's*, in turn, defined the word "open" to mean "[p]atent; visible; apparent; notorious; not clandestine; not closed, settled, fixed, or terminated," Black *supra* at 854, thus appearing to reinforce the *known or notorious* aspect of the term "public." Whitney, however, took a different approach, defining "open" in its primary sense in terms of availability of access, as in "[u]nclosed, literally or figuratively; not shut or closed; hence, affording access, or free ingress and egress: as, an *open* door." Whitney *supra* at 4118. But even Whitney's definition of "open"— particularly his use of the words "literally or figuratively" as equal and alternative modifiers of the word "unclosed"—is arguably sufficiently broad to encompass means of access other than actual physical attendance.

**{50}** Given the competing definitions of "public" set out above, and the absence from historical dictionaries of clear guidance as to the proper meaning of that term when used to describe a governmental proceeding, the public sessions requirement set out in Article IV, Section 12, though beguilingly simple in its text, is unquestionably ambiguous in its meaning. Nothing in the textual language of the public sessions provision clearly conveys the drafters' intent to provide the public with a right of in-person attendance at legislative sessions. The bare use of the term "public" is not an unequivocal indicator of the drafters' intent and certainly does not reflect or "even hint[] that [the drafters] intended to . . . embrace the broadest possible meaning that the definition of the word can bear." *Taniguchi*, 566 U.S. at 569.

**{51}** This textual ambiguity—unrecognized and unaddressed by Petitioners—is fatal to Petitioners' textually-based claim for mandamus relief. As our definitional survey reveals, the word "public" had two primary meanings at the time the framers put it to use in Article IV, Section 12, one denoting known or notorious—as in the opposite of private—and the other relating to access. Given the bare-bones nature of the provision's text, we cannot say that either of the two inconsistent alternative definitions is more "contextually appropriate" than the other. *See In re Estate of Erwin v. Nash*, 921 N.W. 2d 308, 324 & n.15 (Mich. 2018) (Viviano, J., dissenting) ("[W]hen a word has

more than one definition, the context determines the sense in which the [framers] used the word." (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (Thomson/West, 2012)). In practical terms, this means that, for mandamus relief to be warranted here, we would have to conclude that Petitioners' broad reading of the term "public" comports with *both* of the definitional meanings discussed above. 52 Am. Jur. 2d *Mandamus* § 52 (2011) (explaining that where "there is room for difference as to the true construction [of constitutional language] . . . the officer's determination involves the exercise of judgment and discretion" that is beyond the reach of mandamus). No reading of the public sessions provision, plain or otherwise, can support that conclusion.

**{52}**    First, assuming the use of the term "public" in Article IV, Section 12 was intended to convey the term's known or notorious meaning, the Legislature's maintenance and publication of journals of its proceedings as required elsewhere in the same provision would likely satisfy the provision's public sessions mandate. Though the purpose and significance of the counterpart journal-keeping requirement found in Article I, Section 5 of the United States Constitution has garnered little judicial attention, there is considerable consensus among the courts and commentators who have addressed the issue "that the object of the Journal Clause is to ensure transparency in legislative activities." *Pub. Citizen v. U.S. Dist. Court for D.C.*, 486 F.3d 1342, 1349 (D.C. Cir. 2007) (citing *Marshall Field & Co. v. Clark*, 143 U.S. 649, 670-71 (1892); *See also* Joseph Story, *Commentaries on the Constitution of the United States* (5th ed. 1891), Book III, Chapter XII, §§ 839-40 (explaining that the journal requirements found in art. I, § 5 were intended to "insure publicity to the proceedings of the legislature, and a correspondent responsibility of the members to their respective constituents");[18] Shannon E. Martin & Gerry Lanosga, *The Historical and Legal Underpinnings of Access to Public Documents*, 102 Law Libr. J. 613, 614 (2010) (viewing the Journal Clause of art. 1, § 5 as "clearly indicat[ing] that the actions of Congress shall be recorded and made *public*" (emphasis added)). Indeed, when one additionally considers the press coverage afforded the special session and the availability of online information about its agendas and materials, there can be little doubt that the special session was "public" in the known or notorious sense of that term. *See, e.g.*, Note, *Open Meeting Statutes: The Press Fights for the "Right to Know,"* 75 Harv. L. Rev. 1199, 1199 (1962) ("'The people have a right to know!'—that is the battle cry in the crusade to ensure that government operate *in public*." (emphasis added)).

**{53}**    And, although not essential to our ruling today, we note that it is at least arguable that the online, real-time access made available to the special session proceedings via the Legislature's website may alone have been sufficient, from a textual standpoint, to satisfy the availability-of-access element of the definitional term "public." *See Komatsu v. City of N.Y.*, No. 20-CV-7046 (ER), 2021 WL 256956, *1 (S.D.N.Y., Jan. 26, 2021 (suggesting in dicta that the plaintiff's "viewing" of city council meetings held during the COVID-19 pandemic, "which were available for public streaming online" on a platform that allowed "members of the public . . . to testify" at hearings that had "public comment

---

18Available at https://heinonline.org/HOL/Page?handle=hein.beal/css0001&id=659 &collection=beal&index= (last visited June 24, 2021).

portions," was equivalent to "attending" the meetings). This conclusion appears to be consistent with Whitney's treatment of the terms "public" and "open" in his circa 1890 dictionary, which, as mentioned, defined "public," as here relevant, as [o]pen to all the people," and in turn loosely defined "open" as "[u]nclosed, literally *or figuratively*." Whitney *supra* at 4118, 4830 (emphasis added). It is no stretch to conclude that the Council's directive served to accomplish what Whitney's definitions appear to allow, a figurative "unclosing" of the special session albeit through high-technology means. *See generally* Alex Kozinski & Eugene Volokh, *A Penumbra Too Far*, 106 Harv. L. Rev. 1639, 1646-47 (1993) (opining that the usage of certain terms "in their figurative rather than their literal senses makes for . . . an infinitely malleable test . . . , [under which] phrases can mean almost anything"). From a definitional perspective, the textual language of Article IV, Section 12 does not mandate reading "public" to require in-person physical attendance at legislative sessions.

{54}   Beyond the definitional analysis undertaken above, another textual consideration buttresses our conclusion that the bare use of the term "public" in Article IV, Section 12 does not plainly or unequivocally signal the framers' intention to require in-person attendance at this state's legislative proceedings. The standalone use of the indefinite and generic term "public" in the public sessions provision of the New Mexico Constitution comes despite the fact that the drafters had at their disposal but did not avail themselves of more explicit language that would have clearly established an in-person access requirement for legislative sessions. At the time our state Constitution was adopted in 1911, language appropriate for that purpose was available from, among other sources, statutory text then on the books here in New Mexico. We refer specifically to two separate statutes in the 1897 compilation, one governing the holding of court sessions and the other governing the convening of boards of county commissioners. The former provided that "[a]ll courts of [the New Mexico] territory shall be held openly and publicly, and all persons whatsoever shall be *freely admitted* within the same, and permitted there to remain so long as they shall observe good order and decorum." Section 1037, C.L. 1897 (*1897 Compiled Laws of New Mexico* at 336) (emphasis added). As for the latter, the Legislature invoked similar language providing that the sessions of every board of county commissioners "shall be *public with open doors*, and all persons conducting themselves in an orderly manner *may attend* their meetings." Section 666, C.L. 1897 (*1897 Compiled Laws of New Mexico* at 268) (emphasis added). Had the drafters intended the term "public" as used in Article IV, Section 12 to convey the expansive meaning now urged by Petitioners—one signaling a requirement of in-person physical access to all legislative sessions—they presumably would have clearly said so by fashioning language similar to that featured in this pair of then recently enacted statutes. While there may be an explanation as to why comparable language is missing from Article IV, Section 12, Petitioners have not offered one in their scant submission to this Court. Regardless, this Court, "under the guise of judicial interpretation," may not rewrite or add language to our state Constitution. *State ex rel. Sugg v. Oliver*, 2020-NMSC-002, ¶ 19, 456 P.3d 1065; *see also Merrill*, 2021 WL 560780, *12 ("[W]e do not supply constitutional language that the drafters intentionally may have chosen to omit." (internal quotation marks and citation omitted).

{55}   For parallel reasons, the counterpart sibling state constitutional provisions cited by the dissent do not avail Petitioners' plain-language argument. The dissent, while eschewing its own definitional analysis of the term "public," points in particular to language contained in the New York and Wisconsin constitutions that makes plain the public's right to physically attend legislative proceedings held in those states. Dissent ¶ 84 (invoking N. Y. Const. art. III, § 10, and Wis. Const. art. IV, § 10—which command, in provisions identical except for punctuation, that "[t]he doors of each house shall be kept open except when the public welfare shall require secrecy"—as evidence of those state drafters' "intent that the [legislative] doors literally remain open"). But it is difficult to see how the cited out-of-state constitutional provisions help rather than harm Petitioners' stated plain-language theory. Again, as with the more descriptive New Mexico statutory provisions discussed in the preceding paragraph, these more descriptive out-of-state constitutional provisions are most notable for their absence from the New Mexico Constitution. Far from persuading us that Article IV, Section 12 must require in-person attendance at legislative sessions, these counterpart constitutional provisions serve only to highlight the clarifying textual detail that, for reasons unexplored by Petitioners or the dissent, is lacking from Article IV, Section 12. To reiterate, we disagree that the bare use of the term "public" in Article IV, Section 12 necessarily connotes a right to physically attend legislative sessions. "If that were true, the [additional modifying language found] in each of our sister states' constitutional provisions quoted above—and in our own [contemporaneous] statutes . . .—would be superfluous." *In re Interrogatory on House Joint Resol.*, 2020 CO 23, ¶ 40, ___P.3d___.

{56}   At bottom, the uncertainty engendered by the drafters' unelaborated use of the term "public" in Article IV, Section 12 is hardly the stuff of mandamus, which calls for clear-cut grounds, not tenuous or undeveloped argument. Instructive on this point is *Sarkes Tarzian, Inc. v. Legis. of the State of Nev.*, 765 P.2d 1142 (Nev. 1988). That case stemmed from a procedural resolution adopted by the Nevada Assembly providing that certain confidential documents produced in connection with a pending assembly bill were reviewable only in closed committee meetings and that neither the documents themselves nor information obtained from the documents could be disclosed to the public. *Id.* at 1143. An entity wishing to examine the confidential papers in issue brought suit against the Nevada Legislature, ultimately seeking a writ of mandamus from the Nevada Supreme Court preventing the use of closed meetings and a declaration that the anticipated meetings excluding the public were unconstitutional. *Id.* In denying mandamus relief, the court concluded that "no 'clear constitutional mandate' . . . requir[ing] judicial nullification of [the a]ssembly [r]esolution" was to be found in Article 4, Section 15 of the Nevada Constitution, *Sarkes Tarzian*, 765 P.2d at 1143-44 (quoting the trial court), whose provisions—at that time, and as originally approved and ratified in 1864—stated that "the doors of each House shall be kept open during its session, except the Senate while sitting in executive session," *id.* at 1142 n.2. In so ruling, the court pointed out that the constitutional provision did not "mention the *committees* of either house" and that "the constitutional debates also fail to indicate any constitutional intent to open all committee meetings as were 'the doors of each House . . . during its session,' that is, during a meeting of the entire body of the house." *Id.* at 1144 (omission in original) (quoting the trial court). Recognizing that the legislature's authority over its own procedures was deserving of "'great deference,'" the court declined to interfere with

the assembly's action, "there being no clear constitutional prohibition against it." *Id.* at 1143-44 (quoting the trial court). Similar to the situation in *Sarkes Tarzian*, there is simply no clear or explicit constitutional mandate to be found in the public sessions provision at hand that would justify mandamus relief in the form of "judicial nullification" of the attendance restrictions imposed by the Council's directive. *Id.* at 1143.

### b. The propriety—or lack thereof—of a sua sponte historical analysis

**{57}** As indicated, Petitioners have made no effort to overcome the obvious frailties in their plain-language argument, neither attempting to explain why we should resolve in their favor the patent ambiguities created by the public sessions requirement of Article IV, Section 12, nor citing any canon of constitutional construction that would tend to support their expansive reading of that provision. For reasons set out herein, we decline in these circumstances to address those issues sua sponte or to craft any constitutional interpretation arguments on Petitioners' behalf.

**{58}** As a general rule, appellate courts rely on adversarial briefing to decide legal issues and avoid reaching out to construct legal arguments that the parties, intentionally or otherwise, have not presented. *See Cone v. Bell*, 556 U.S. 449, 482 (2009) ("Appellate courts generally do not reach out to decide issues not raised by the appellant [or other party seeking relief.]"). Much has been written by courts and commentators in favor of the wisdom of this rule and about the perils and pitfalls in deviating from its well-established norm. The Georgia Supreme Court provided a simple and succinct explanation of the rule in *Turner v. Flournoy*:

> It is not the function of [an appellate court] to advocate or advance positions not advanced by the parties. With rare exceptions, this Court, like all appellate courts, should decide the issues presented by the parties, as the parties present them. When we do otherwise, when we decide an issue sua sponte, we invite error because the issue has not been fleshed out fully; it has not been researched, briefed and argued by the parties. Moreover, the parties are blind-sided when an appellate court reaches an issue on its own motion. They have no inkling that the court even thought about such an issue until they receive and read the court's opinion. That is not fair.

594 S.E. 2d 359, 361-62 (Ga. 2004) (footnotes omitted).

**{59}** Avoidance of sua sponte judicial action makes particular sense in the realm of constitutional interpretation. As another state supreme court has observed, "[constitutional] interpretation is a complex task, requiring courts to weigh many variables before arriving at a balanced and reasonable construction of [the drafters'] intent," a task made all the more difficult without the benefit of proper briefing and reasoned argument. *Bartus v. Wis. Dep't of Health & Soc. Servs.*, 501 N.W.2d 419, 424 (Wis. 1993) (urging courts "to exercise caution" before addressing such issues sua sponte).

**{60}** These reasons alone provide ample justification for this Court to refuse to tread where Petitioners have not. But there is more.

**{61}** That the origins of Article IV, Section 12 took root over a century ago necessarily complicates any interpretative analysis this Court might undertake on its own initiative and makes a sua sponte frolic all the more untenable. The difficulties in interpreting longstanding constitutional provisions are widely understood, as are the dangers of taking up on a court's own initiative a historical analysis that necessarily entails a systematic and searching inquiry.[19] *See Neese v. Utah Bd. of Pardons and Parole*, 2017 UT 89, ¶¶ 95-98, 416 P.3d 663 (observing, in the context of a state due process challenge to a parole board's action, that a relevant historical analysis demands "deep immersion in the shared linguistic, political, and legal presuppositions and understandings of the ratification era"). Justice Scalia, no novice when it came to the intricacies of textualist theory, readily acknowledged that "[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *McDonald v. City of Chicago*, 561 U.S. 742, 803-04 (2010) (Scalia, J., concurring). And there is no dearth of case law reflecting a corresponding judicial reluctance to tackle such weighty analytical questions without input from the parties. *See, e.g.*, *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169-70 (10th Cir. 2012) (declining to address a "large and complicated" Second Amendment issue whose resolution involved a "textual-historical inquiry [that was] unaddressed in the parties' briefs, []or . . . in the record"); *Neese*, 2017 UT 89, ¶¶ 66-67 (exercising "historiographical restraint" in declining to undertake a "review of ratification-era common law and other historical sources . . . without prompting from the parties" or "the benefit of adversarial briefing").

**{62}** In the procedural posture presented here, and since the petition does no more than briefly gesture at the public sessions issue and then only touches on the textual, not the historical, underpinnings of Article IV, Section 12, adherence to "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary to not to decide more"—is especially compelling. *See PDK Labs.*, *Inc. v. D.E.A*, 362 F.3d 786, 799 (D. C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment).

**{63}** Our exercise of judicial restraint in this matter is also consistent with if not dictated by the extraordinary nature of the mandamus remedy sought by Petitioners and time-honored principles governing mandamus proceedings. One such core principle is that mandamus generally will not lie to compel or prohibit an act where, as here, the duty to act "is not plainly prescribed but is to be gathered by a doubtful inference from a statute [or constitutional provision.]" 52 Am. Jur. 2d *Mandamus* § 52. And while courts have departed from this rule in situations where the interpretation of an ambiguous statute or constitutional provision readily yields "a peremptory obligation for the officer to

---

19For purposes of this discussion and in the absence of adversarial briefing on the issue, we take no definitive position as to the appropriate standard by which to scrutinize the public sessions issue. Instead, we assume without endorsing the propriety of the dissent's exclusive reliance on a historical analysis of the kind which forms the focus of the analytical framework used to approach Second Amendment jurisprudence, rather than an ends-means analysis of the kind generally associated with First Amendment jurisprudence.

act," *see Lovitky v. Trump,* 949 F.3d 753, 760 (D.C. Cir. 2020) (internal quotation marks and citation omitted), we discern no sound reason to countenance such a departure unsolicited and without input from Petitioners in this case. *See generally State ex. rel. Coleman v. Wexler Horn*, 568 S.W.3d 14, 25 (Mo. banc 2019) (Powell, J., dissenting) ("[I]n seeking mandamus, [t]he burden [is] upon relator to plead and prove a clear legal right to the relief asked." (second and third alterations in original) (internal quotation marks and citation omitted)). The point is that mandamus is not available just for the asking—or, as applied here, to these Petitioners who did not see fit to ask for any form of constitutional interpretation beyond the written text of Article IV, Section 12 to determine the availability of mandamus. To ignore the shortcomings in the petition and engage sua sponte in the often tricky business of interpreting an ambiguous constitutional provision would unfairly deprive the Council of the opportunity to weigh in on a vital issue and undermine the "orderly procedure" served by the well-established rule that "only matters properly in issue may be considered" in a mandamus proceeding. *See* 55 C.J.S. *Mandamus* § 383 (Supp. 2021). This we cannot do.

### c.    A response to the dissent

**{64}**    Before closing, a few comments about the dissent are in order. As the dissent portrays it, our treatment of Petitioners' Article IV, Section 12 argument "divests the general public of its right to attend any legislative session in person." Dissent ¶ 88. It is not clear which part of our opinion the dissent relies on for this sweeping assertion. To the extent we reach any holding on the Article IV, Section 12 issue, it is only that the petition *in this case*, given its limited scope, fails to establish a clear cognizable constitutional violation. We make no broad interpretive pronouncements *as a matter of law* on the intended reach of what we determine to be a "patent[ly] ambigu[ous]" constitutional provision. Maj. op. ¶ 57. As we have taken pains to emphasize, we choose not to definitively settle here and now Petitioners' inartfully-framed state constitutional argument for prudential reasons, opting instead to leave that task for another day and the benefit of informed adversarial briefing. In this posture, our opinion cannot properly be read to make new law, much less to divest our citizens of any recognized constitutional rights.

**{65}**    The dissent also takes this opinion to task for failing to construe the term "public" so as to provide guidance on the meaning of that term at its "constitutional minimum." Dissent ¶ 70. As we understand it, this critique faults us for not doing more in offering guidance on an issue that we have deliberately chosen not to fully decide. To that extent the critique misses its mark, for an appellate court, in declining to decide an issue head-on for whatever reason, can offer only so much gratuitous advice on that same issue without rendering an improper advisory opinion. *See generally State v. Rodgers*, 235 S.W.3d 92, 97 (Tenn. 2007) ("However convenient or desirable for either party that the questions mooted in the case be authoritatively settled for future guidance, the court is not justified in violating fundamental principles of judicial procedure to gratify this desire." (internal quotation marks and citation omitted)); *see also United States v. Schiavo*, 504 F.2d 1, 27 (3rd Cir. 1974) (Aldisert, J., dissenting) (noting that guidance on a particular issue "must await the proper case or controversy"). Of necessity, the appellate process, and the appellate courts that oversee it, are subject to appropriate,

oft self-imposed, constraints. As one court commented, echoing the sentiments so eloquently expressed by Judge Cardozo, "Appellate judges are not knights errant, scanning the horizon for issues in distress that call out for rescue or remedy." *Campbell v. State*, 177 A.3d 80, 82 (Md. Ct. Spec. App. 2017); *see* Benjamin N. Cardozo, *The Nature of the Judicial Process* 141 (1921) ("[A judge] is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness."). We conclude without hesitation that judicial guidance on the intended meaning of the term "public" as used in Article IV, Section 12 must await the proper case or controversy.

**{66}**    As a final matter, our dissenting colleagues, in their apparent zeal to champion a previously unrecognized right to attend legislative sessions under Article IV, Section 12, omit any reference to a matter that would seem central to their analysis. The unaddressed matter we refer to involves the reliance, if any, placed by the dissent on the deferential review standard set out in *Jacobson* for government action taken during an emergency, 197 U.S. 11, in assessing the constitutionality of the challenged directive, which the Council issued at a time when the COVID-19 virus was spreading quickly in this and other states. As previously discussed, *see* maj. op. ¶ 36, we in the majority have no occasion to apply the *Jacobson* doctrine in disposing of this case. Resort to *Jacobson*'s deferential review standard is made unnecessary by our outright rejection of Petitioners' meritless due process claim and our decision to address the Article IV, Section 12 public sessions issue as it was presented to us, treating only Petitioners' lone plain-language argument. But the same cannot be said of the dissent, which, it would appear, has directly implicated the *Jacobson* doctrine in reaching out to fully resolve in Petitioners' favor the complex and controversial state constitutional question so narrowly presented in the petition. One would have thought it incumbent on the dissent to address the hot-button *Jacobson* issue before proclaiming the Council's pandemic-related directive unconstitutional and, in the process, coming close to "inject[ing] uncertainty into an area where uncertainty has human costs." *S. Bay United Pentecostal Church v. Newsom*, ___U.S.___, 141 S. Ct. 716, 723(2021) (Kagan, J., dissenting from the grant of injunctive relief).

## III.    CONCLUSION

**{67}**    For the foregoing reasons, we abide by our prior order denying the mandamus petition, maintaining the view that the New Mexico Legislative Council's directive prohibiting in-person attendance at the June 2020 special session was not shown to violate a clear and indisputable legal duty.

**{68}    IT IS SO ORDERED.**

**JUDITH K. NAKAMURA, Justice, Retired, sitting by designation**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice, dissenting**

**DAVID K. THOMSON, Justice, dissenting**

**BACON and THOMSON, Justices (dissenting).**

**{69}** We respectfully dissent on two grounds. First, Article IV, Section 12 of the New Mexico Constitution limits the Legislature's authority to exclude the public from individually attending the sessions in person. Second, even were we to pass on the constitutional question, the Council lacked the legislative authority to make the important public policy decision to exclude the public from the Capitol during the special session.

## I.   THE DOORS TO THE CAPITOL MUST REMAIN OPEN TO PROVIDE PUBLIC ACCESS

**{70}** Article IV, Section 12 requires, "All sessions of each house shall be public." The broad nature of this limitation on the authority to close legislative sessions has been noted by at least one source, which states that New Mexico is one of two states where "there are no exceptions to the requirement that sessions be open stipulated in their constitutions." Frank Thayer, *Legal Control of the Press, Concerning Libel, Privacy, Contempt, Copyright, Regulation of Advertising and Postal Laws* 40 (4th ed. 1962). The Court's majority opinion creates an exception that ostensibly allows the Legislature to eliminate in-person access for average citizens to the Capitol during all legislative sessions, while simultaneously failing to construe "public" to give any guidance on what constitutes the constitutional minimum. *See* maj. op. ¶ 53. However, based on the facts of this case, online or virtual access exceeds the constitutional minimum required by Article IV, Section 12.

**{71}** In advance of the special session,[20] a legislative subcommittee passed, without opposition, "a directive prohibiting on-site, public attendance at the special session." *See* maj. op. ¶ 4. The majority's effective endorsement of this directive should be clearly

---

[20]Despite this being a legislative session called specifically to address the budget and related issues created by the COVID-19 crisis, it appears that other issues were advanced and enacted, the subject matter of which did not directly concern the reason the special session was called. *See, e.g.*, H.B. 5, 54th Leg., 1st Special Sess. (N.M.2020), *available at* https://nmlegis.gov/Sessions/20%20Special/bills/house/HB0005.pdf (last visited June 24, 2021) (concerning the creation of a New Mexico Civil Rights Commission); S.B. 4, 54th Leg., 1st Special Sess. (N.M. 2020), *available at* https://nmlegis.gov/Sessions/20%20Special/bills/senate/SB0004.pdf (last visited June 24, 2021) (concerning temporary changes to the election code); S.B. 8, 54th Leg., 1st Special Sess. (N.M. 2020), *available at* https://nmlegis.gov/Sessions/20%20Special/bills/senate/SB0008.pdf (last visited June 24, 2021) (concerning the use of law enforcement body cameras). Furthermore, the internet, as a sole means of access, is inherently, unreliable. This was highlighted during the special session, when both the internet and Zoom failed. *See* Jens Gould, *Tech Issues Slow Down Special Session*, The Santa Fe New Mexican (Jun. 19, 2020), https://www.santafenewmexican.com/news/coronavirus/tech-issues-slow-down-special-session/article_ccbef9c6-b26a-11ea-b46c-d72b61c35c7b.html (last visited June 24, 2021); Rachel Knapp, *2020 Special Session: Lawmakers Off To A Slow Start*, KRQE News 13 (Jun. 19, 2020), https://www.krqe.com/news/politics-government/2020-special-session-lawmakers-off-to-a-slow-start/ (last visited June 24, 2021).

stated—the Legislature has the power to pass a rule for the Capitol that closes the doors to the general public, at any time, and for any reason, so long as the session meets the minimum constitutionally acceptable standard for being public, which remains unclear. Respectfully, the majority should choose its path and state that it is deferring to the Legislature's construction of "public" *or* actually take up the task of construing Article IV, Section 12 in a manner that provides the greatest benefits to the citizens, instead of implying the sessions were public enough. *See* maj. op. ¶ 53.

**{72}**  We read our Constitution to provide two separate and distinct means of assuring governmental transparency:

> *All sessions of each house shall be public. Each house shall keep a journal of its proceedings* and the yeas and nays on any questions shall, at the request of one-fifth of the members present, be entered thereon. The original thereof shall be filed with the secretary of state at the close of the session, and shall be printed and published under his authority.

N.M. Const. art. IV, § 12 (emphasis added). The two emphasized provisions serve different purposes; the second does not qualify or establish the minimum required to satisfy the first. The drafters of the New Mexico Constitution chose to require that "[a]ll sessions . . . be public," which demonstrates an evolution from the United States Constitution, born from our founders' unique concern that the actions of the government should be transparent to any citizen who might wish to know how the business of governance was being conducted.

**{73}**  The second provision, which requires the "keep[ing of] a journal," provides the citizens of New Mexico with a minimal record of the past, what the Legislature has done, and how their elected delegate previously voted. *See Bezio v. Neville*, 305 A.2d 665, 668 (1973) (reasoning that "the journals . . . were intended to furnish the courts and the public with the means of ascertaining what was actually done in and by each branch of the Legislature," both for the purpose of public scrutiny and to assure legislative conformity with constitutional provisions (internal quotation marks and citation omitted)).

**{74}**  The first provision requires that the sessions "be public," allowing citizens to have contemporaneous access to observe and participate in the session. The construction of this provision is at the heart of the issue in this opinion. We must recall, our Constitution both grants authority to the "legislative, executive and judicial" branches, *see* N.M. Const. art. III, § 1, and limits that grant of authority to benefit the governed, *see*, *e.g.*, N.M. Const. art II, § 18 (providing that "[n]o person shall be deprived of life, liberty or property without due process of law"); N.M. Const. art. IV, § 12. The "public clause" of Article IV, Section 12 is a limitation on the authority of the Legislature. Therefore, construed with a modicum of common sense, "public" must be read broadly to limit the Legislature's ability to lock and bar the doors of the Capitol in a manner that minimizes citizen participation.

**{75}** Guidance from the United States Supreme Court provides that, in interpreting constitutional text:

> [W]e are guided by the principle that the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning. Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.

*District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008) (alteration omitted) (internal quotation marks and citations omitted); *see also United States v. Sprague,* 282 U.S. 716, 731 (1931) ("The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning; where the intention i[s] clear there is no room for construction and no excuse for interpolation or addition. "); *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 188 (1824).

**{76}** The majority construes "public" in Article IV, Section 12 contrary to the lessons of *Heller*: the majority construes public to mean *broadcast* to the general public via the internet (which allows for online comments) and limited media outlet coverage. We do not read the requirement in Article IV, Section 12 that the "sessions . . . shall be public" to allow the Legislature to completely eliminate the general public's right to attend and observe the legislative session in person.[21]

**{77}** The use of the term "public" is an improvement on the more minimal requirement in the United States Constitution's journal clause to provide more transparency, and more information to the general public on how their government is working. *See* U.S. Const. art. I, § 5, cl. 3 ("Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy."). Speaking on a similar improvement in the Pennsylvania Constitution, James Wilson aptly wrote, "The regulation—that the doors of each house, and committees of the whole, shall be open—I view as an improvement highly beneficial both in its nature and in its consequence—both to the representatives and to their constituents." 1 *The Works of James Wilson, Legis. Dep't, Lectures on Law*, *1791 Works* 420-22 (Robert Green McCloskey ed., 1967).

---

[21]This is particularly true in a state where, as here, there are communities that do not have access to broadband internet. Thus, solely relying on the internet to broadcast the legislative sessions effectively shrouds the legislative process from the view of tens of thousands of New Mexicans. *See* Teya Vitu, *New Mexico Ranks Among the States Least Connected to Broadband*, Las Cruces Sun News (Dec. 26, 2018), https://www.lcsun-news.com/story/news/local/new-mexico/2018/12/26/new-mexico-rank-states-least-connected-broadband-internet/2411338002/ (last visited June 24, 2021); Jens Gould, *New Mexico Legislators Hampered by Internet Access Issues*, The Santa Fe New Mexican (Sept. 21, 2020), https://www.govtech.com/network/New-Mexico-Legislators-Hampered-by-Internet-Access-Issues.html (last visited June 24, 2021); Susan Montoya Bryan, *New Mexico Still Lagging Despite Broadband Investments*, The Santa Fe New Mexican (Nov. 13, 2019), https://www.santafenewmexican.com/news/local_news/new-mexico-still-lagging-despite-broadband-investments/article_f43f0827-df34-58f2-9a51-dec83c0a5ee9.html (last visited June 24, 2021).

**{78}** Rejecting Petitioners' plain-language argument, the majority states that "Petitioners neither identify independent indicia of the drafters' intent nor mention, much less discuss, any canon of statutory or constitutional construction that would tip the scales in resolving any ambiguity." Maj. op. ¶ 44. The majority then concludes that "the undefined and unadorned word 'public' as used in Article IV, Section 12 yields no plain meaning." Maj. op. ¶ 45. We disagree. Article IV, Section 12, which requires "[a]ll sessions . . . shall *be public* (emphasis added)," speaks directly to a concern that the workings of the government be transparent and corrects an omission from the United States Constitution, which only requires that an edited journal of the proceedings occasionally be published. *See* U.S. Const. art. I, § 5, cl. 3.

**{79}** The right of the public to have access to legislative debate and representative deliberations is a beneficial evolution from the United States Constitution. As much as we appreciate the majority's exposition of the early history of the development of self-government to assert that the term *public* is ambiguous, on this point, we recognize that we have evolved. Despite the majority's contention that the analysis of this historical evolution places us on an "uncharted, unbriefed, and unvetted path," maj. op. ¶ 7, we proceed with the recognition that, "constitutional history [] helps us to preserve the lessons embodied in the drafting of the provisions at issue and to explore the consequences of the language chosen." Robert F. Williams, *The Brennan Lecture: Interpreting State Constitutions As Unique Legal Documents*, 27 Okla. City U. L. Rev. 189, 205 (2002) (internal quotation marks and citation omitted). In assessing this difficult issue, if we must look to the history of a dictionary (as the majority has done) or the history of constitutional text (as we do), we respectfully suggest the latter is a better approach as, "state constitutions have their own unique origins, history, language, and structure—all of which warrant independent attention and elucidation." *Delaware v. Van Arsdall*, 475 U.S. 673, 706-07 (1986) (Stevens, J., dissenting).

**{80}** Prior to the nineteenth century, legislative branches of government in both England and the United States met in secret. In England, members of that elected body feared retribution from the Crown. *See* Elison, *supra*, at 179 ("In England, parliamentary debates were originally closed to the public on the theory that secrecy protected against interference by the Crown and later debates were closed to conceal the members' statements and votes from constituents."); Elizabeth Gregory McPherson, *Reporting the Debates of Congress*, 28 Q. J. of Speech 141 (1942) ("Publication of the [parliamentary] debates . . . was surrounded with danger to both reporter and publisher."); Harold L. Cross, *The People's Right to Know, Legal Access to Public Records and Proceedings* 180 (1953). Colonial legislatures carried on this tradition, as did the Continental Congress. The Constitution was drafted with limited allowance for public participation.

**{81}** In his autobiography, John Adams recounted the founders' discussion of the Articles of Confederation, stating his desire for more transparency:

> Mr. Wilson of Pennsylvania, upon one Occasion moved that the debates should [be] public, the Doors opened, galleries erected, or an Adjournment made to some public Building where the People might be accommodated.

Mr. John Adams seconded the Motion and supported it, with Zeal. But No: Neither Party were willing:

Founders Online, Nat'l Archives, The Adams Papers, *Diary and Autobiography of John Adams, Vol. 1, Tuesday, Aug. 20, 1776*, https://founders.archives.gov/documents/Adams/01-03-02-0016-0173 (last visited June 24, 2021).

{82}    Representative bodies at the state level struggled with this during the ratification of the Constitution. "The convention also made its official journal available to any printer who requested it. But what about the people who insisted on witnessing the event with their own eyes and ears?" Pauline Maier, *Ratification, The People Debate the Constitution, 1787-1788* 166 (2010) (footnote omitted). Government recalcitrance toward allowing more public participation in the legislative process prevailed in early United States history demonstrated by the limited requirement of Article I, Section 5, Clause 3 of the United States Constitution.

{83}    After the ratification of the Constitution, the focus shifted to create a procedural change to implement a policy of increased transparency. In the early sessions of Congress, James Monroe (then a Senator from Virginia) moved "that the doors of the Senate Chamber remain open whilst the Senate shall be sitting in a legislative capacity," except on such occasions as, in their judgment, may require secrecy." 1 *The Writings of James Monroe* lxxiii (Stanislaus Murray Hamilton ed., 1898). The United States House of Representatives opened its doors to observers in 1789, the United States Senate held out until 1795.[22] *Id.* at 284.

{84}    States however give substance to the Adams' theory of public participation in legislative sessions. New York made clear its intent that the doors literally remain open:

> Each house of the legislature shall keep a journal of its proceedings, and publish the same, except such parts as may require secrecy. The doors of each house shall be kept open, except when the public welfare shall require secrecy. Neither house shall, without the consent of the other, adjourn for more than two days.

N.Y. Const. art. III, § 10. Wisconsin's constitution requires that "[t]he doors of each house shall be kept open except when the public welfare shall require secrecy." Wis. Const. art. IV, § 10. Interestingly, the United States Congress found it important enough to include as an obligation on the government of several territories. *See, e.g.*, 48 U.S.C. § 1573 (2018) (requiring that "[a]ll sessions of the legislature shall be open to the public" for the legislature of the Virgin Islands). The majority herein determines that broadcasting proceedings over the internet is adequate to make them public, but we do not read broadcasting proceedings to be sufficient under Article IV, Section 12; the

---

22U.S. Senate, *Reporters of Debate and the Congressional Record*, https://www.senate.gov/artandhistory/history/common/briefing/Reporters_Debate_Congressional_Record.htm (last visited June 24, 2021).

doors to the Capitol must remain open to provide public access. *See Meyer v. Grant*, 486 U.S. 414, 424 (1988) (holding that "[t]he First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing").

{85}   This Court does not defer to the Legislature when we interpret the New Mexico Constitution; regardless of the constitutional grant of authority to the Legislature to adopt is own rules of procedure, we must determine what is required by Article IV, Section 12. *See* N.M. Const. art. IV, § 11 ("Each house may determine the rules of its procedure."); *Ballin*, 144 U.S. at 5 (determining that although the Constitution grants the authority to make rules, courts nonetheless have the exclusive authority to determine whether enacted rules violate the Constitution); *Vander Jagt*, 699 F.2d at 1173 (same).

{86}   The grant of authority to a branch of government to determine its procedural rules does not necessarily convey deference to that branch of government to determine whether such rules pass constitutional muster. *Id*. We take issue with the majority opinion insofar as it could suggest that the Legislature's prerogative to enact procedural rules requires us to defer to a determination by the Legislature that any rule enacted is constitutional, simply because the Legislature has the power to enact a rule.

{87}   Deference to the Legislature in the governance of its own affairs does not include delegating our obligation to ensure that the Legislature's rules comport with the Constitution. *See The Federalist No. 78*, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("A constitution is, in fact, and must be regarded by the judges, as a fundamental law."). This is an obligation that this Court has repeatedly recognized:

> Deeply rooted in American Jurisprudence is the doctrine that state constitutions are not grants of power to the legislative, to the executive and to the judiciary, but are limitations on the powers of each. No branch of the state may add to, nor detract from its clear mandate. It is a function of the judiciary when its jurisdiction is properly invoked to measure the acts of the executive and the legislative branch solely by the yardstick of the constitution.

*State ex rel. Clark v. Johnson*, 1995-NMSC-048, ¶ 20, 120 N.M. 562, 904 P.2d 11 (quoting *State ex rel. Hovey Concrete Prods. Co. v. Mechem*, 1957-NMSC-075, ¶ 2, 63 N.M. 250, 316 P.2d 1069 (1957), *overruled on other grounds by Wylie Corp. v. Mowrer,* 1986-NMSC-075, 104 N.M. 751, 726 P.2d 1381 (1986)).

{88}   Let us speak plainly, although the majority recounts numerous facts concerning the current COVID-19 public health emergency, *see* maj. op. ¶¶ 2-5, those facts do not bear on the majority's holding and are not necessary to the majority's reasoning. The majority yields to the Legislature's interpretation of the term *public* in a way that gives the Legislature free rein to completely eliminate in-person access for the general public to the Capitol, so long as the Legislature provides limited remote access (and some media coverage) to the sessions, pandemic or not. The majority opinion's endorsement of this construction divests the general public of its right to attend any legislative session

in person. We do not dissent because we conclude that the Legislature cannot reasonably restrict access to a legislative session. We dissent because we reason that the majority opinion determines that Article IV, Section 12, does not mandate any in-person access to any legislative session, which is contrary to historical reasoning and a plain meaning of the term "public" in a constitutional clause directed at ensuring governmental transparency.

## II.     THE LEGISLATIVE BODY AS A WHOLE SHOULD MAKE THE IMPORTANT POLICY DECISION TO LIMIT PUBLIC ACCESS

**{89}**     In addition to our disagreement with the majority's overly broad constitutional analysis, we also respectfully dissent because the Legislature improperly abdicated its responsibility to make this important policy decision, to close the special session to any in-person participation by the public. While we agree with the majority's assertion that the Legislature has the power to adopt its own rules of procedure, *see* N.M. Const. art. IV, § 11, here, the purported rules of procedure relied upon by the Council do not confer the power to delegate the issue at hand to the Council. *See* maj. op. ¶ 12.

**{90}**     The Council asserts that it, and it alone, had the authority to close the Capitol to the public during the special session. Specifically, the Council states:

> By advocating for a risky course of allowing many members of the public into the building, the petition also ignores that the safe use of the Capitol is expressly delegated by law to the Legislative Council, *see* NMSA 1978, § 2-3-4 (1953), and to the Legislative Council Service Director. *Id.* § 2-3-[5].

Section 2-3-3 delineates the Council's powers and duties. These duties largely focus on the establishment of interim committees. A plain-language reading of the statute does not grant the Council the authority to make a sweeping determination to exclude entirely the public from the legislative session. *See DeWitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 29, 146 N.M. 453, 212 P.3d 341 ("The first and most obvious guide to statutory interpretation is the wording of the statutes themselves."); *State v. Martinez*, 1998-NMSC-023, ¶ 8, 126 N.M. 39, 966 P.2d 747 ("We look first to the words chosen by the Legislature and the plain meaning of the Legislature's language."). The substance of this section states that the "control, care, custody and maintenance of the building," as previously held by "the *capitol buildings improvement commission*, and the *capitol custodian commission*," are now transferred "to the Legislative Council." Section 2-3-4 (emphasis added).

**{91}**     The legislative language begs for a review of the duties previously held by the capitol building improvement commission and the capitol custodian commission. *See State v. Javier M.*, 2001-NMSC-030, ¶ 31, 131 N.M. 1, 33 P.3d 1("Although we primarily look to the plain language, we may also consider the history and background of the statute to determine the Legislature's intent."); *State v. Cleve*, 1999-NMSC-017, ¶ 8, 127 N.M. 240, 980 P.2d 23 (advising that a court may give constructive effect to "the context surrounding a particular statute, such as its history, its apparent object, and other statutes in pari materia"); *see also* Uniform Statute and Rule Construction Act,

NMSA 1978, § 12-2A-20(B)(5) (1997) (stating a previous statute can be used to construct a current statute).

**{92}** The Legislature created the capitol buildings improvement commission to establish adequate quarters for the legislative and executive departments, relieve congestion in current facilities, employ architects, acquire land, and the like. *See* NMSA 1953, §§ 6-2-1 to -12 (1963 Supp., repealed 1968). These duties have no bearing on decisions related to the business of the Legislature or who may attend sessions of the Legislature.

**{93}** The capitol custodian commission's duties are those suggested by the title itself. Additionally, the statutory scheme makes clear that the role of this commission was the "preservation, repair, care, cleaning, heating and lighting" of the building and the care and beautification of the grounds. *See* NMSA 1953, §§ 6-1-9 to -15. Again, duties that have no bearing on the Council's decision here.

**{94}** Section 2-3-5 addresses the role of the Director of the Legislative Council Service. Of the various subsections, the one most notable is subsection I, which provides that the Director shall "make all rules and regulations for the conduct of all persons in and about the building and grounds under his control necessary and proper for the safety, care and preservation of the same." "Of the same" refers to the building and grounds—the safety, care and preservation of the building and grounds. This section also falls short of establishing the authority to determine who may attend sessions of the Legislature.

**{95}** Our established rules of statutory interpretation should guide this discussion. This Court's primary goal in statutory interpretation is to effectuate legislative intent. *See, e.g., Baker v. Hedstrom*, 2013-NMSC-043, ¶ 11, 309 P.3d 1047; *Jordan*, 2010-NMSC-051, ¶ 15. The first and primary indication of legislative intent is the plain-language reading of a statute. *See, e.g., DeWitt*, 2009-NMSC-032, ¶ 29; *State v. Young*, 2004-NMSC-015, ¶ 5, 135 N.M. 458, 90 P.3d 477. As we engage in this plain language analysis, we must be mindful "not [to] read into a statute any words that are not there, particularly when the statute is complete and makes sense as written." *State v. Trujillo*, 2009-NMSC-012, ¶ 11, 146 N.M. 14, 206 P.3d 125. In light of any ambiguity, we may consider the history and background of the statute. *See, e.g., State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939; *Javier M.*, 2001-NMSC-030, ¶ 31; *Cleve*, 1999-NMSC-017, ¶ 8.

**{96}** As we look to Sections 2-3-3, -4, and -5, we must, in accordance with our principles of statutory construction, ascribe legislative effect to those statutes. In doing so, we first look at the plain language. As detailed above, the statutes largely vest the Council with administrative duties, custodial obligations for certain facilities, and the ability to aid in certain legislative functions. This is true not only of the Sections 2-3-3, -4, and -5, but for all of the sections found in Chapter 2, Article 3. *See generally* §§ 2-3-1 to -18. Thus, a plain-language reading of Sections 2-3-3, -4, and -5 indicates clear delineations of the Council's powers and duties. The statutes yield little support for the proposition that the Council has the authority to make fundamental policy decisions on

behalf of the Legislature. Indeed, concluding that the Council has such authority would impermissibly "read into [the] statute[s] any words that are not there." *Trujillo*, 2009-NMSC-012, ¶ 11. The plain language of the statutes at hand sets forth clear, unambiguous mandates for the Council: the ability to make sweeping policy determinations is not one of them.

**{97}** Even if one were to find ambiguity in Sections 2-3-3, -4, and -5, the statutory history of the Council would resolve that ambiguity. *See Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 33, 147 N.M. 583, 227 P.3d 73 ("[W]e consider the statute's history and background insofar as it may help to give effect to the Legislature's intent and aid us construing [a statute]." (internal quotation marks and citation omitted)). The Council assumed the various duties of the capitol buildings improvement commission, *see* NMSA 1953, §§ 6-2-1 to -24, and the capitol custodian, *see* NMSA 1953, §§ 6-1-10 to -17. *See also* § 2-3-4 (transferring these duties to the Council). These now-defunct statutory commissions were assigned the control, care, custody, and maintenance of legislative buildings. The Legislature's decision to fold these two commissions into the Council indicates legislative intent for the Council to have custodial control of the capitol building. This legislative history does not, however, lend support to finding the Council is vested with the ability to make policy decisions on behalf of the Legislature. In summary, the use of the term "public" should be granted its broadest meaning that would give effect to its clear meaning and intent in providing transparency and access to the citizens of this State.

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**