# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2024-NMCA-026

Filing Date: December 20, 2023

No. A-1-CA-40390 & A-1-CA-40405

STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,

 Petitioner-Appellee,

v.

ERIC E.,

 Respondent-Appellant,

and

CHERYLE E.,

 Respondent,

IN THE MATTER OF KELISHAUN B.,

 Child.

and

STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,

 Petitioner-Appellee,

v.

CHERYLE E.,

 Respondent-Appellant,

and

**ERIC E.,**

   Respondent,

**IN THE MATTER OF KELISHAUN B.,**

   Child.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Bradford J. Dalley, District Court Judge**

Children, Youth & Families Department
Mary McQueeney, Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Cravens Law LLC
Richard H. Cravens, IV
Albuquerque, NM

for Appellant Eric E.

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant Cheryle E.

Therese E. Yanan
Farmington, NM

Guardian Ad Litem

**OPINION**

**YOHALEM, Judge.**

**{1}** This is an appeal from the adjudication of neglect of K.B. (Child), an Indian child, by his guardians and Indian custodians, Cheryl E. and Eric E. (collectively, Guardians). Both Child and Guardians are enrolled members of the Navajo Nation. This case is governed by the federal Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963 and the New Mexico Abuse and Neglect Act, NMSA 1978, §§ 32A-4-1 to -35

(1993, as amended through 2023).[1] We address Guardians' separate appeals together in this opinion in light of the shared record and common issues. Guardians raise a number of issues on appeal concerning the Voluntary Placement Agreement (VPA) they entered into with the Children, Youth, & Families Department (CYFD) months before CYFD filed a petition for abuse and neglect, as well as issues relating to the adjudication of neglect subsequently entered against them. Because we conclude it is dispositive, we address Guardians' claim that CYFD failed to present sufficient evidence to establish that, prior to the filing of an abuse and neglect petition seeking to remove an Indian child for temporary placement where the parents, guardians, or Indian custodian cannot have the child returned on demand, § 1903(1)(i), "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." § 1912(d). We agree with Guardians that the evidence at the adjudicatory hearing was insufficient to establish by clear and convincing evidence that CYFD made the concerted, active efforts tailored to the unusual circumstances of this case required by ICWA § 1912(d) prior to the filing of the abuse and neglect petition. We reverse the adjudication of neglect and remand for proceedings consistent with this opinion.

**BACKGROUND**

**{2}** Child was born in December 2007 to Arlinda A. (Mother) and Rupert B. (Father). Mother and Father were named as interested parties by CYFD in the abuse and neglect petition that is the subject of this opinion.

**{3}** Eric is Mother's cousin. In 2015, Child was seven or eight years old, in the legal custody of the Navajo Nation, and living temporarily at the Navajo Mission. Eric and his then-wife, Cheryle,[2] agreed at the request of Navajo Nation Social Services to take Child into their home. At that time, Child's two older sisters and younger brother were living with Guardians. At one point, Child and four of his siblings, as well his sister's baby, were living with Guardians, along with Guardians' own children.

**{4}** Although Guardians agreed to take Child into their home in 2015, they did so reluctantly because they were aware that Child had lived with Eric's aunt and then with Eric's mother, and that neither had been able to handle Child's problematic behavior. The district court found that Child had significant mental health and behavioral issues because of trauma and mistreatment experienced prior to placement with Guardians.

---

[1] We note that in 2022 the New Mexico Legislature adopted a new statute governing abuse and neglect proceedings concerning Indian children: the Indian Family Protection Act (IFPA), NMSA 1978, §§ 32A-28-1 to -42 (2022, as amended through 2023). The abuse and neglect petition at issue in this case was filed on December 9, 2021, prior to the enactment of IFPA. We, therefore, rely on the provisions of the New Mexico Abuse and Neglect Act and the federal ICWA, both of which continue to apply to proceedings involving Indian children in New Mexico. ICWA is now supplemented by the provisions of IFPA. See § 1921 (noting that if state or federal law applicable to a child custody proceeding "provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under" ICWA, the higher state or federal standard shall apply).

[2] The parties divorced during these proceedings.

**{5}** In 2017, after Child had lived with them for two years, Guardians became the legal guardians of Child and two of his siblings in a dependency proceeding pending before the Family Court of the Navajo Nation. The Navajo court found that Child's biological parents were unable or unwilling to care for him at that time, but did not terminate their parental rights.

**{6}** The district court found, based on the testimony at the adjudicatory hearing, that during the years Child was in Guardians' home, there were increasingly severe problems involving Child's behavior, particularly aggression directed at younger children. Guardians sought assistance and advice from Navajo Nation Social Services and CYFD as Child's behavior deteriorated. Guardians obtained counseling for Child and family therapy at Desert View Family Counseling Services. When Child's aggressive behavior toward the younger children in the home escalated, Guardians took him to a hospital, and upon doctor's advice, placed him at Mesilla Valley Hospital's inpatient program for adolescents for seven days.

**{7}** Following this inpatient treatment, Child returned to Guardians' home for approximately two more years. Near the end of that period, in 2019, the medications, counseling, and therapy that Guardians had obtained for Child no longer seemed to be working. Child began harming the family cat, harming himself, collecting sharp objects and hiding them, and threatening to kill Eric. Cheryle testified that she realized that Child needed "a lot more than [she] was capable of doing." Counselors suggested a residential treatment center; doctors at the regional hospital who examined Child agreed. Guardians placed Child at San Marcos Treatment Center, a Texas residential treatment facility, in August 2020. It was after this placement that Cheryle attempted suicide and realized, with the help of therapy, that she was overwhelmed and could not provide the care Child needed if he was returned home.

**{8}** In January 2021, CYFD received a child protective services report from San Marcos alleging neglect by Guardians based on their unwillingness to sign paperwork and otherwise assist in Child's discharge to a less restrictive setting. San Marcos reported that Child would be ready to be discharged from San Marcos in February 2021. Child could not be discharged because Guardians refused to participate in treatment meetings, to sign consents, or to allow Child to be placed back in their home. San Marcos recommended transferring Child to treatment foster care.3

**{9}** When contacted by a CYFD investigator about San Marcos's complaint of neglect of Child, Guardians told CYFD that they were unable to continue to care for Child. They informed CYFD that they intended to revoke their guardianship of Child. CYFD and Guardians entered into a VPA in March 2021. Notice was sent to the Navajo Nation.

---

3We note that treatment foster care is a type of foster care placement for children in CYFD custody, *see* 8.10.2.7(T), (Z) NMAC (including treatment foster care as a "placement" for children in CYFD custody as a result of an action under the Children's Code), that provides treatment designed to transition the child to a family placement.

**{10}** The VPA, approved by the district court on April 16, 2021, gave CYFD temporary legal custody of Child,4 thereby avoiding CYFD having to immediately file a petition for abuse and neglect against Guardians. CYFD and the district court understood that Guardians were unable to care for Child and would be seeking to relinquish their guardianship of Child in tribal court during the 180 days the VPA was in effect. CYFD agreed that a VPA, giving CYFD temporary legal custody of Child, was in the best interest of Child.

**{11}** Permanency planning worker Corene Martinez, the CYFD caseworker assigned to work with Child and Guardians, informed Guardians that until the guardianship was revoked, they were responsible for attending family-centered meetings and maintaining contact with CYFD and Child. Guardians were also told that if the guardianship was revoked during the pendency of the VPA, CYFD would not file against them for abuse and neglect of Child. A VPA does not prevent CYFD from filing a petition for abuse and neglect either when the VPA expires, or when the parents or guardians terminate the VPA if CYFD has "documented concerns regarding the safety and well-being of your child/children."

**{12}** Guardians hired a lawyer who was a member of the Navajo bar to assist them in obtaining an order revoking the guardianship. Guardians testified that they had little knowledge of how tribal court worked. Their lawyer filed an emergency petition with the tribal court to discharge Guardians in August 2021. When the VPA expired in October 2021, the tribal court had not yet ruled on the motion to revoke the guardianship.

**{13}** During the term of the VPA and following its expiration, Guardians gradually withdrew from their responsibility to remain in contact with CYFD and Child. Although it had legal custody of Child for the six months of the VPA, CYFD did not place Child in treatment foster care as recommended by San Marcos, or with a family member; he remained at San Marcos despite being ready for discharge. At the time CYFD filed its petition against Guardians for abuse and neglect, on December 9, 2021, and took Child into involuntary state custody, Child remained at San Marcos.

**{14}** The petition for abuse and neglect states that CYFD made the following efforts to prevent the breakup of the Indian family prior to removing Child for involuntary placement in state custody: (1) CYFD investigated the report of neglect by San Marcos and entered into a VPA with Guardians; (2) CYFD hosted family-centered meetings; (3) CYFD made multiple attempts to contact Guardians by telephone; (4) CYFD located Child's mother and then lost contact with her; (5) CYFD located another family member "but have not been able to complete the initial relative assessment." The petition states that the efforts were unsuccessful because Guardians refused to communicate with CYFD.

---

4The VPA gave temporary legal custody of Child to CYFD, as provided for in CYFD regulations. *See* 8.10.8.11(B) NMAC ("[CYFD] may accept legal custody of a child placed voluntarily through a written agreement.").

**{15}** On January 11, 2022, a month after the petition alleging neglect and abandonment by Guardians was filed in state court, the Navajo tribal court informed Guardians' counsel that the original dependency case from 2015 involving Child had been closed, that a new petition was required, and that the petition must be served on Child's biological parents.

**{16}** Not long afterward, in February 2022, the district court conducted an adjudicatory hearing on CYFD's abuse and neglect petition. Ms. Martinez, who was assigned to work with Child and Guardians, was the sole CYFD employee to testify for the agency. Ms. Martinez was questioned about CYFD's failure to place Child in treatment foster care during the lengthy period he was in CYFD's legal custody prior to the filing of a petition for abuse and neglect. It was undisputed that Child still remained at San Marcos at the time of Ms. Martinez's testimony on February 22, 2022. Ms. Martinez claimed that CYFD's hands were tied: CYFD could not do anything without Guardians' authorization. Ms. Martinez testified that Child could not be discharged from San Marcos to a less restrictive treatment foster care setting because Guardians would not authorize the transfer. There was no evidence at the adjudicatory hearing about the efforts, if any, made by CYFD to have Child discharged from San Marcos and transferred to treatment foster care. The only efforts Ms. Martinez reported making were repeated telephone calls to Guardians. The district court relied on Ms. Martinez's testimony to find that Guardians' failure to sign the appropriate papers resulted in Child remaining at San Marcos, a highly restrictive institutional setting, which the court found was inappropriate, for a year after he was ready to be discharged.

**{17}** When asked what assistance CYFD had provided Guardians in revoking the guardianship and freeing Child for possible return to one of his biological parents or to other extended family members, the case worker admitted CYFD had not provided any assistance. When asked why CYFD had offered no assistance, Ms. Martinez simply stated that it was "with the Navajo Nation court."

**{18}** The only other effort reported by CYFD in its testimony at the adjudicatory hearing to avoid having to place Child in involuntary state custody was a routine absent parent search for Child's biological mother and father. The search located Mother in prison. Although Mother expressed interest in reuniting with Child, CYFD lost touch with her upon her release from prison. CYFD's routine search did not succeed in locating Father, and although Child's paternal grandmother had expressed interest in caring for Child, CYFD never completed an assessment of her home.

**{19}** Father contacted CYFD in December 2021, apparently after being notified that an abuse and neglect petition had been filed against Guardians. Father and Mother were not named as respondents, but are identified in the petition and were served. Father contacted CYFD in December 2021, and told Ms. Martinez that he wanted to regain custody of Child and was willing to work with CYFD. Ms. Martinez reported having several phone calls with Father after the December custody hearing.

**{20}** A social worker with the Navajo Nation, Lynette Mose, testified at the adjudicatory hearing as the ICWA expert. Ms. Mose testified she had not been involved with this case prior to January 21, 2022, a few weeks before the adjudicatory hearing, and that she was testifying based solely on her review of documents provided by CYFD and the evidence she heard presented at the adjudicatory hearing. She testified about the strong Navajo tradition of family members caring for children who needed a home and opined that family members generally felt an obligation to remain involved with a child once they began to care for them. She testified that return of Child to Guardians in this case, in her opinion, would result in serious emotional and physical damage to Child, and that it was in Child's best interest to be placed with other relatives able to care for him. CYFD did not question Ms. Mose about the adequacy of the efforts made by CYFD prior to placing Child in involuntary state custody. The district court asked Ms. Mose whether she believed CYFD had made active efforts to avoid filing a petition for abuse and neglect and involuntarily placing Child in state custody. Ms. Mose responded that she believed active efforts had been made, without pointing to any evidence supporting her belief or otherwise explaining her opinion. On cross-examination by Guardians, Ms. Mose was asked what efforts CYFD could have made to assist Child and his family during the period CYFD had voluntary legal custody of Child. She responded that she did not work for CYFD and did not know.

**{21}** At the conclusion of the hearing, the district court expressed understandable frustration with the choices available to the court. The district court asked counsel for CYFD whether the court could realistically do anything other than continue Child in CYFD custody under the circumstances. CYFD's counsel did not suggest an alternative. The district court then noted that it believed Guardians had made the best choices they could make and had appropriately tried to involve CYFD and other social services agencies in Child's care. The court, nevertheless, found that Guardians had neglected Child by "actively hindering further placement, treatment and progress of [Child]" by not signing the papers for treatment foster care, forcing Child to remain in a residential facility for more than a year after he was ready to be discharged to a less restrictive setting. The district court found Guardian's efforts to revoke the guardianship "dilatory and insufficient," noting in particular the failure of Guardians' counsel to serve Child's biological parents. The district court noted that Guardians remained legally responsible for Child, and concluded that Guardians had neglected and abandoned Child. Addressing the ICWA requirement that CYFD make active efforts under ICWA to prevent the unnecessary removal of Indian children from their family and tribe into involuntary state custody, the district court concluded that "[t]he efforts made by CYFD in this case have been active, reasonable, and unsuccessful at preventing breaking up this family."

**{22}** At the dispositional hearing, the Court Appointed Special Advocate (CASA) urged the district court to include in its dispositional order a requirement that CYFD engage in active efforts with Child's parents—efforts to find Mother to serve her with notice and to work with Father—rather than delaying these efforts until the guardianship was revoked by the tribal court or was terminated by the district court based on abuse or neglect by Guardians.

**{23}** We discuss additional evidence later, as necessary to our decision.

**DISCUSSION**

**{24}** Guardians raise a number of issues on appeal. Cheryle makes the following arguments: (1) she was entitled to ICWA § 1912 procedural protections, including court-appointed counsel, at the district court hearing approving the VPA; (2) she was entitled to notice of her right to move the proceedings to tribal court at that same hearing; (3) she did not understand and was not adequately informed that failure to participate in Child's care during the VPA could result in CYFD filing a petition for abuse and neglect against her; (4) CYFD failed to make active efforts to assist Guardians prior to entering into the VPA; (5) her rights to due process were violated by CYFD's failure to act as Child's legal custodian during the term of the VPA; (6) the evidence at the adjudicatory hearing was insufficient to support the court's findings that she had neglected Child; and (7) CYFD failed to make the active efforts required by ICWA § 1912(d) to prevent the removal of Child into the involuntary custody of CYFD prior to initiating abuse and neglect proceeding. Eric argues: (1) the evidence was insufficient to support abandonment for the time period required by Section 32A-4-2(A); (2) the evidence was insufficient to support the district court's finding of neglect of Child by Guardians; and (3) CYFD failed to make the active efforts required by ICWA § 1912(d) prior to filing the petition for abuse and neglect and taking Child into involuntary CYFD custody.

**{25}** We agree with Guardians that CYFD failed to present substantial evidence to support the district court's finding that CYFD made active efforts to prevent the unnecessary removal of an Indian child into involuntary state custody as required by ICWA § 1912(d). We conclude that ICWA requires that these active efforts be made from the time CYFD begins to work with a family in response to a referral for abuse or neglect of an Indian child, with the goal of avoiding the involuntary removal of that Indian child into state custody, and that the district court's finding that active efforts have been made must be supported by substantial evidence of record as to the efforts made, not merely by conclusory assertions that active efforts have been made. Because our decision requires reversal of the adjudicatory judgment,[5] we do not reach the other issues raised by Guardians on appeal.

**I.     The District Court's Finding That CYFD Made the "Active Efforts" Required by ICWA § 1912(d) Prior to Filing the Petition for Abuse and Neglect Is Not Supported by Substantial Evidence in the Record**

**{26}** Before we address the sufficiency of the evidence, we must construe ICWA's requirement for active efforts by the state agency prior to removing an Indian child into involuntary state custody. Two questions are important to the resolution of this case:

_____

[5]We note that ICWA § 1914 authorizes the child, parent, or Indian custodian, or the tribe to move to set aside any foster care placement or termination of parental rights on the grounds the rights secured under §§ 1911, 1912, or 1913 were violated, even after a judgment has been upheld on appeal.

When active efforts are required and what efforts are sufficient to satisfy the active efforts requirement at an adjudicatory hearing.

**{27}** Section 1912(d) of ICWA states as follows:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

In § 1903(1)(i), ICWA defines a "foster care placement" as follows:

> [A]ny action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated.

**{28}** When a petition for abuse and neglect seeking removal of an Indian child from the custody of their parent, legal guardian, or Indian custodian6 is filed by CYFD, our Supreme Court has held that the district court must make the findings required by ICWA § 1912(d) at the adjudicatory hearing, including the finding that active efforts designed to prevent the breakup of the Indian family have been made. *State ex rel. Child., Youth & Fams. Dep't v. Marlene C.*, 2011-NMSC-005, ¶ 2, 149 N.M. 315, 248 P.3d 863. The required finding by the district court must either be based on clear and convincing evidence regarding the efforts CYFD has made, or on an admission by the respondent that those efforts have been made. Even when admitted by the parent or Indian custodian, the district court's finding that active efforts were made must be supported by a factual basis in the record. *See id.* ("We hold that, in a contested adjudication to which ICWA applies, the district court must always make the findings of fact required under § 1912(d) . . . of ICWA at the adjudication stage, founded either on evidence of record or admissions supported by a factual basis."). Our Supreme Court in *Marlene C.* thus held that satisfying the district court that active efforts have been made requires more than a conclusory statement. *Id.*

**{29}** While our Supreme Court has made clear that the burden to introduce sufficient evidence of active efforts is on CYFD, and that an adjudicatory judgment of abuse or neglect of an Indian child cannot be upheld without a finding supported by clear and convincing evidence, our Supreme Court did not address the two questions raised here: When the efforts must begin and the nature of the efforts, which must be made prior to the initiation of an involuntary custody proceeding.

---

6An "Indian custodian" is defined by ICWA to mean "any Indian person who has legal custody of an Indian child under tribal law or custom or under [s]tate law or to whom temporary physical care, custody, and control has been transferred by the parent of such child." § 1903(6).

## A.    ICWA's Active Efforts Requirement

**{30}**   We look first to our existing precedent. Although this Court has previously construed the active efforts requirement, that construction has been in the context of a proceeding to terminate parental rights and has focused on the efforts CYFD must make to implement a treatment plan aimed at reuniting parents and children after an adjudication of abuse or neglect. *See, e.g., State ex rel. Child., Youth & Fams. Dep't v. James M.*, 2023-NMCA-025, ¶ 18, 527 P.3d 633, *cert. denied*, 2023-NMCERT-002 (S-1-SC-39716); *State ex rel. Child., Youth & Fams. Dep't v. Yodell B.*, 2016-NMCA-029, ¶ 20, 367 P.3d 881, *overruled on other grounds by State ex rel. Child., Youth & Fams. Dep't v. Maisie Y.*, 2021-NMCA-023, ¶ 23, 489 P.3d 964; *State ex rel. Child., Youth & Fams. Dep't v. Arthur C.*, 2011-NMCA-022, ¶¶ 41-45, 149 N.M. 472, 251 P.3d 729, *superseded by statute on other grounds as stated in State ex rel. Child., Youth & Fams. Dep't v. Tanisha G.*, 2019-NMCA-067, ¶ 11, 45 P.3d 86.

**{31}**   Our precedent construing the "active efforts" requirement has compared the reasonable efforts to assist a parent with their treatment plan required by our Abuse and Neglect Act, § 32A-4-28(B)(2), with the active efforts required by ICWA during the same time period. In a termination of parental rights case not subject to ICWA, CYFD must establish, as a condition precedent to the termination of parental rights, "that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by the department or other appropriate agency to assist the parent in adjusting the conditions that render the parent unable to properly care for the child." *Id.* This Court has held that the "active efforts" standard imposed by ICWA is a "more involved and less passive standard than that of reasonable efforts." *Yodell B.*, 2016-NMCA-029, ¶ 20 (internal quotation marks and citation omitted). Our Supreme Court agreed, adopting the distinction drawn by this Court in *Yodell B.*, that "[p]assive efforts are where a plan is drawn up and the client must develop [their] own resources towards bringing it to fruition. Active efforts is where the state . . . takes the client through the steps of the plan rather than requiring that the plan be performed on its own." *State ex rel. Child., Youth & Fams. Dep't v. Keon H.*, 2018-NMSC-033, ¶ 42, 421 P.3d 814 (omission, internal quotation marks, and citation omitted).

**{32}**   In this case, we are asked to determine what efforts are required by ICWA "to prevent the breakup of the Indian family" prior to taking an Indian child into involuntary state custody. *See* § 1912(d). There is no parallel reasonable efforts requirement under state law that applies at this stage of the proceedings.[7] We, therefore, cannot define active efforts in this context as simply providing more hands-on assistance in obtaining the services CYFD generally includes in a treatment plan. We look to the principles of statutory construction to define the term "active efforts" in this context. We then review the record to determine whether CYFD presented sufficient evidence at the adjudicatory hearing to support the district court's finding that, to the degree of certainty required by

---

[7]State law requires CYFD to give notice to the child's relatives, *see* § 32A-4-17.1, but there is no requirement of proof before an adjudicatory judgment can be entered that reasonable efforts were made to avoid taking the child into state custody.

the clear and convincing evidence standard, CYFD made the active efforts required by ICWA "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." § 1912(d).

**{33}** Interpretation of ICWA and its relationship to the New Mexico Abuse and Neglect Act presents a question of law that we review de novo. *Marlene C.*, 2011-NMSC-005, ¶ 14. "Our overarching goal when interpreting ICWA is to effectuate Congress's intent." *Id.* ¶ 15. "In determining legislative intent, we look to the plain language of the statute and the context in which it was enacted, taking into account its history and background." *Pirtle v. Legis. Council Comm.*, 2021-NMSC-026, ¶ 14, 492 P.3d 586. If additional guidance is needed to determine congressional intent, we accord substantial weight to the federal Bureau of Indian Affairs (BIA) regulations and the BIA interpretive guidelines published with the regulations. *See Marlene C.*, 2011-NMSC-005, ¶ 18 (describing the guidelines as "persuasive authority," and relying on them to interpret ICWA); *see also State ex rel. Child., Youth & Fams. Dep't v. Douglas B.*, 2023-NMSC-028, ¶¶ 14-15, 539 P.3d 294 (relying on both the recently adopted BIA regulations and the longstanding guidelines). In addition to these general rules of statutory construction, both our Supreme Court and the United States Supreme Court have held that "when construing ICWA we must resolve all ambiguities liberally in favor of the Indian parent and the tribe in order to effectuate the purpose of the Act." *Marlene C.*, 2011-NMSC-005, ¶ 19; *see Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.").

**{34}** The statutory language of ICWA § 1912(d) fails to offer any detail about when active efforts must begin or what services will satisfy the active efforts requirement. We look beyond the plain language of § 1912(d) to other sections of ICWA and to the congressional policy expressed both within the statute itself and in the legislative history in an effort to determine the timing and nature of the active efforts CYFD was required to make in this case.

**{35}** In ICWA § 1902, Congress states that it is the purpose of ICWA

> to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum [f]ederal standards for the removal of Indian children from their families.

Congress focuses on its responsibility to protect Indian families, tribes, and their resources, identifying a tribe's children as its most vital resource. *See* § 1901(3) ("[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children."). Based on the extensive hearings it conducted prior to the passage of ICWA, Congress found that state agencies and state courts "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families[,]" resulting in the unnecessary removal of Indian children from their family and community. § 1901(5); *see*

*also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32-36 (1989) (detailing the congressional hearings).

**{36}** Unlike state abuse and neglect statutes, which focus the efforts of state agencies on the general welfare of the child and on protecting parental rights, ICWA focuses more broadly on maintaining an Indian child's relationship with their extended family and their tribe. ICWA not only protects the tribes' interest in retaining their children, ICWA also protects the interest of Indian children in retaining their connection to their extended family and tribe. Congress equates an Indian child's best interest with maintaining and preserving that child's relationship to their Indian family and tribe. As the Montana Supreme Court cogently stated, "The principal purpose of ICWA is to promote the stability and security of Indian tribes by preventing further loss of their children; and to protect the best interests of Indian children by retaining their connection to the tribes." *In re C.H.*, 2003 MT 308, ¶ 11, 318 Mont. 208, 79 P.3d 822 (internal quotation marks and citation omitted). The rights of the Indian child's parents or Indian custodian are recognized and protected as well, but the purpose of ICWA extends beyond protecting the rights of the child's parents or Indian custodian. *See Holyfield*, 490 U.S. at 37 ("ICWA . . . seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society." (internal quotation marks and citation omitted)); *Haaland v. Brackeen*, 599 U.S. 255, 265 (2023) (describing the purpose of ICWA, and of § 1912(d) in particular, as "to keep Indian children connected to Indian families"). In this regard, we note the important role of the "Indian family" in ICWA. It is "the breakup of the Indian family" that active efforts are intended to prevent. *See* § 1902 (providing that ICWA is intended to "promote the stability and security of Indian . . . families"). The United States Supreme Court identified the central role played by the Indian family in ICWA, noting that "[a]n Indian child may have scores of, perhaps more than a hundred, relatives who are counted as close, responsible members of the family" who share in raising an Indian child. *Holyfield*, 490 U.S. at 35 n.4.

**{37}** With this background on the purpose of ICWA, we next turn to the definition of "active efforts." In the absence of a precise definition of "active efforts" on the face of the statute, we consider the definition found in the Code of Federal Regulations at 25 C.F.R. § 23.2 (2023). As noted previously in this opinion, these regulations and the federal guidelines that supplement them are relied upon by our Supreme Court to construe ICWA. *See Douglas B.*, 2023-NMSC-028, ¶¶ 14-15. The regulations first define the term "active efforts" and then follow that definition with a list of examples of the kinds of services and assistance most often required to preserve an Indian child's family and the child's connection to their tribe. The definition reads, in relevant part, as follows:

> Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with [their] family. . . . To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be

conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case.

25 C.F.R. § 23.2. This definition and the examples that follow it echo the policies adopted by Congress. The definition of active efforts focuses on the timeliness of those efforts, provides that they be directed to maintaining the Indian child with their family, or, if a separation has already occurred, reuniting the child with their family, and specifies that efforts be conducted, to the maximum extent possible, in partnership with the Indian child's tribe and extended family. *Id.*

{38}     Likewise, this definition of active efforts emphasizes the requirement that the state agency work together with the child's tribe and extended family whenever possible, to evaluate the unique needs of that family, and then tailor the agency's efforts "to the facts and circumstances of the case." *Id.* Where it is apparent that the usual services offered in a treatment plan or the usual method of proceeding by the state agency will not address the unique needs of the Indian child and their family, or where services are not available in a remote area of a reservation, ICWA demands the state agency address the barriers to services and provide alternatives tailored to the circumstances, rather than relying on their usual method of operating. 25 C.F.R. § 23.2(10). Active assistance in utilizing, accessing, and overcoming barriers to services is required regardless of the stage of the proceedings. *Id.*

{39}     In terms of the timing of active efforts, the regulations state that the efforts must be "thorough[] and timely." 25 C.F.R. § 23.2. The state agency cannot wait until the Indian child is taken into state custody, an adjudication obtained, and a treatment plan adopted, as is often the case under state law, to begin its efforts. In the preadjudication context, active efforts are intended to *prevent* the removal of an Indian child from their extended family and tribe. § 1912(d). To be effective, remedial efforts must be undertaken promptly upon referral to the agency for abuse or neglect. The sole exception is for an emergency placement, where harm to the child is imminent. *See* § 1922 (providing an exception to allow immediate state custody in an emergency threating "imminent physical damage or harm to the child").

{40}     The ICWA regulations and the legislative history of ICWA support this construction of § 1912(d)'s requirement for remedial active efforts provided prior to initiating a placement and designed to prevent having to take a child into state custody. In its report, the House Committee on Interior and Insular Affairs explained the purpose of the active efforts requirement in § 1912(d), stating,

> The committee is advised that most state laws require public or private agencies involved in child placement to resort to remedial measures *prior to initiating placement . . . proceedings*, but that these services are rarely provided. This subsection imposes a Federal requirement in that regard with respect to Indian children and families.

H.R. Rep. No. 95-1386, at 263 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7531, 7545 (emphasis added).

**{41}** We next apply these policies and standards, both as to timing and as to the nature of the efforts required, to the evidence concerning CYFD's efforts in this case to avoid taking Child into state custody.

**B. The Evidence Does Not Support a Finding That CYFD Made the Active Efforts Required by ICWA § 1912(d)**

**{42}** Although we review the findings of fact of the district court for sufficiency of the evidence, deferring to the district court's credibility determinations, and drawing inferences in favor of the district court's findings, we review the district court's application of the law to the facts de novo. *State ex rel. Child., Youth & Fams. Dep't v. Lisa A.*, 2008-NMCA-087, ¶ 6, 144 N.M. 324, 187 P.3d 189. In reviewing for substantial evidence in the record to support a finding, we are mindful of CYFD's burden to prove each element required to support an adjudicatory judgment by clear and convincing evidence. *See James M.*, 2023-NMCA-025, ¶ 14 (the clear and convincing evidence standard applies to proof of ICWA requirements at an adjudication involving an Indian child). "To meet the clear and convincing evidence standard, the evidence must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Child., Youth & Fams. Dep't v. Alfonso M.-E.*, 2016-NMCA-021, ¶ 26, 366 P.3d 282 (internal quotation marks and citation omitted). Our standard of review therefore is whether, "viewing the evidence in the light most favorable to [CYFD], the fact[-]finder could properly determine that the clear and convincing evidence standard was met." *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 3, 120 N.M. 463, 902 P.2d 1066. We are mindful as well of the requirement imposed by our Supreme Court that there must be a factual basis in the record to support the district court's finding that active efforts were made. *Marlene C.*, 2011-NMSC-005, ¶ 2.

**{43}** As previously noted, the district court found that "[t]he efforts made by CYFD in this case have been active, reasonable, and unsuccessful at preventing breaking up this family." We conclude, in light of the foregoing, that the evidence at the adjudicatory hearing does not support the court's finding that active efforts were made by CYFD.

**{44}** Guardians argue, in relevant part, that the efforts CYFD described making ignored the facts and circumstances of this unusual case, failed to comprehensively assess the circumstances of Child's extended family, failed to focus on maintaining or restoring Child's connection to his extended family, his tribe, and his community, and were at best passive, and not the active efforts required by ICWA. We agree.

**{45}** As discussed previously in this opinion, CYFD understood based on its investigation following the report of abandonment and neglect from San Marcos that Guardians could not continue as Child's Indian custodians and that Guardians intended to relinquish their guardianship. It was clear from CYFD's investigation of the original

report of abuse or neglect that an involuntary foster care placement of Child would have to be initiated unless successful active efforts were made to return Child to either a biological parent or to other members of his extended family.

**{46}**    CYFD is correct that it was not required by ICWA to make active efforts to prevent taking Child into *voluntary* state custody pursuant to the VPA. *See Marlene C.*, 2011-NMSC-005, ¶ 22 (holding that voluntary placement agreements are not subject to the requirements of § 1912 of ICWA, but are instead governed by ICWA § 1913). In this case, it was evident from CYFD's initial involvement with Guardians following the referral from San Marcos of neglect of Child that if CYFD made no efforts to prepare Child for return to his extended family and tribe and made no efforts with Child's biological parents and extended family members, CYFD would be left with no option but to take Child into involuntary state custody. We, therefore, review the evidence describing the efforts made by CYFD from the date of the referral forward until the petition for abuse and neglect was filed and Child taken into involuntary state custody on December 9, 2021. *See Walker E. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 608 (Alaska 2021) (The appellate court looks to the entirety of the state's efforts to determine if they are adequate.).

**{47}**    The sole CYFD employee who testified on behalf of the agency, Ms. Martinez, began her testimony about CYFD's efforts with CYFD's receipt of the referral for neglect from San Marcos. She reported that CYFD conducted an investigation, speaking with Guardians and determining that Guardians were unwilling and likely unable, due to Cheryle's health concerns, to continue as Child's Indian custodians. CYFD agreed to enter into a VPA with Guardians, which was described by both Ms. Martinez and Guardians at the adjudicatory hearing as intended to avoid filing an immediate petition for abuse and neglect against Guardians, allowing them time (1) to relinquish the guardianship and free Child for placement with other family members; (2) to ensure Child was discharged from San Marcos and provided the treatment foster care San Marcos recommended; and (3) to locate and prepare a parent or extended family member willing and able to meet Child's special needs in the community. The remainder of Ms. Martinez's testimony showed that CYFD made little or no effort in any of these three areas identified as necessary to prevent taking Child into involuntary state custody.

**{48}**    The sole efforts described by CYFD during the nine-month period between the referral for neglect and the initiation of an involuntary custody proceeding were repeated telephone calls to Guardians to try to get them involved in working with Child and CYFD until the guardianship could be officially terminated by the Navajo Tribal Court. During the six months the VPA was in place and continuing for the additional three months that preceded Child being taken into involuntary state custody, there was no evidence showing that CYFD made any effort to contact and work with Child's tribe. The only contacts reported by CYFD in its testimony at the adjudicatory hearing were the mandatory written notices ICWA requires be sent to an Indian child's tribe when a VPA is filed in state court and when an abuse and neglect petition is filed. Despite the fact that Navajo social services had been involved with Child from an early age, Child had

been in tribal custody, and tribal social services had been involved in placing Child with Guardians, there is no evidence that CYFD made any effort to explore whether there were tribal resources available to help locate and to assist Child's family. The ICWA expert at the adjudicatory hearing, a social worker employed by the Navajo Nation, testified that she was involved by CYFD only after the abuse and neglect petition was filed and only for the purposes of providing testimony at the adjudicatory hearing. She testified she had not attended any meetings concerning Child, and that her knowledge of the case was based on her review of the documents provided to her after she was asked to testify as the ICWA expert at the hearing.

{49}   Although CYFD agreed that it was in Child's best interest for the guardianship to be revoked in order to free Child to be reunited with a biological parent or placed with extended family members, Ms. Martinez testified that CYFD did nothing to assist Guardians in relinquishing the guardianship despite the barriers they encountered. We are not convinced that, given the difficulty Guardians were experiencing in tribal court and their admitted ignorance of the proper procedures, that some assistance from CYFD in addressing what was, after all, conflicting jurisdiction in tribal and state court over the same child, was not called for by the active efforts requirement.

{50}   Although much of the reasoning behind the VPA was that it would allow CYFD to place Child in the treatment foster care he needed to continue to make progress on his aggressive behavior and his mental health issues (both barriers to his return to his tribal community), CYFD failed to find a treatment foster care placement for Child. Child remained at San Marcos throughout the six months the VPA was in place, and still had not been placed in treatment foster care in February 2022. The district court found that San Marcos was an inappropriate and unnecessarily restrictive setting for Child throughout this entire period. When asked what CYFD had done to place Child in treatment foster care, Ms. Martinez testified that her hands were tied because Guardians refused to cooperate. Although this testimony, if accurate, might well support a finding by the district court that CYFD had made appropriate efforts and that further efforts would have been futile, this testimony was patently incorrect. Ms. Martinez's testimony was directly contradicted by documentary evidence in the record showing conclusively that CYFD had legal custody of Child during the term of the VPA and, therefore, had legal authority to place Child without authorization from Guardians. A district court order in the record gave CYFD legal custody of Child. As a matter of law, legal custody gives CYFD the authority to determine Child's placement and to make treatment decisions for Child. *See* NMSA 1978, § 32A-1-4(T) (2023) (defining "legal custody" as vesting in the legal custodian, in relevant part, with "the right to determine where and with whom a child shall live" and the right to consent to medical and psychological care).

{51}   On review for sufficiency of the evidence, this Court may reject the testimony of a witness the fact-finder has believed where the statement is obviously incorrect. *See State v. Sanders*, 1994-NMSC-043, ¶ 13, 117 N.M. 452, 872 P.2d 870. Ms. Martinez's testimony on this point is in direct conflict with the statutory definition of "legal custodian." CYFD concedes as much in its brief on appeal. We note that the expert

testimony of Ms. Mose to her belief CYFD made active efforts is similarly flawed. She testified that she did not know what CYFD was authorized to do, indicating she, like the district court, was relying on the case worker's testimony as the basis for her opinion that CYFD's efforts were adequate under ICWA.

**{52}**    The evidence in the record also shows that CYFD's efforts to find a parent or extended family member able to care for Child when his treatment was completed were minimal. CYFD did not complete a home study of Child's paternal grandmother, a relative that expressed interest in caring for Child. Both of Child's biological parents were alive, their parental rights had not been terminated, and both, when ultimately located, expressed an interest in having Child returned to their care. It appears from the evidence that Father was the parent most likely to be able to care for Child. The CYFD case worker testified that CYFD ran a routine missing person check to find Father, but that the phone numbers were inaccurate and CYFD was not successful in locating him. Given that CYFD understood that Child could not be returned to Guardians' care, that Mother was in prison and unlikely to be able to care for Child, working with Child's Father was likely the best way, consistent with ICWA, of preserving Child's Indian family and maintaining his relationship with his tribe. Ms. Martinez testified she had been in telephone contact with Father, but only since he contacted CYFD after Child was taken into state custody in December. Given the importance of Father as Child's biological parent and as a potentially viable placement option, we are not persuaded that running a routine search for Father and making a handful of telephone calls, constituted the active efforts required by ICWA prior to initiating an abuse and neglect proceeding.

**{53}**    In sum, the narrowly limited efforts described by CYFD in its testimony at the adjudicatory hearing are insufficient to constitute the active efforts required by ICWA prior to taking an Indian child into involuntary state custody. CYFD's efforts were not tailored to the goal of restoring Child to his parents, to his extended Indian family, or to his tribal community. CYFD failed to do the very things it had recognized when it entered into the VPA with Guardians were necessary to avoid having to take Child into involuntary state custody. It failed to actively search for Child's father and prepare him to reunite with Child. It failed to contact and obtain assistance from Child's tribe. It failed to provide any assistance to Guardians in freeing Child for return to a parent or placement with an extended family member. It offered no evidence to show that it had made active efforts to place Child in the treatment foster care recommended by San Marcos to help prepare him for return to his community. We conclude that the district court's finding that the active efforts required by ICWA were made by CYFD is not supported by substantial clear and convincing evidence in the record.

**CONCLUSION**

**{54}**    Because a finding that active efforts have been made prior to initiating a proceeding for involuntary state custody is a required element of an adjudication of abuse or neglect in a case involving an Indian child, we reverse. We remand for further proceedings consistent with this opinion.

{55}    IT IS SO ORDERED.

JANE B. YOHALEM, Judge

WE CONCUR:

MEGAN P. DUFFY, Judge

KATHERINE A. WRAY, Judge